IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION


PATRICK J. CHAREST, #182262,          :

    Plaintiff,          :

vs.          :          CIVIL ACTION 20-0214-TFM-N

KAY IVEY, *et al.*,          :

    Defendants.          :


## REPORT AND RECOMMENDATION


Plaintiff, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983. This action has been referred to the undersigned for appropriate action pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R). Presently, before the Court is Plaintiff's motion for a preliminary injunction. (*see* Doc. 4, PageID.24, "Emergency Notice of Imminent Danger Inside ADOC of Covid-19 Updated Facts & Cause for Public Alarm Through Amendment"). After careful review of Plaintiff's submissions and Defendants' response, it is recommended that Plaintiff's motion for a preliminary injunction be denied.

I. **Proceedings.**

    A. **Complaint.** (Doc. 1).

    Plaintiff filed a § 1983 complaint against Alabama Governor, Kay Ivey, and G. K.

Fountain Correctional Facility (Fountain) Warden, Mary Cooks,[1] alleging "(1) failure to protect [and] provide prevent[ive] supplies[,] services, [and] testing of COVID-19; (2) deliberate indifference to imminent danger of physical danger/death of COVID-19[; and] (3) 28 U.S.C. § 2244 is unconstitutional, [a] violation of [First and Fourteenth] Amend[ments] of U.S. Const[itution]." (Doc. 1 at 11, PageID.11). For relief, Plaintiff requested the Court to "issue a declaratory judgment – preliminary injunction [for] emergency COVID-19 testing, prevention of services, [and] supplies for living areas [and] kitchen etcetera[.]" (*Id.* at 13, PageID.13).

When Plaintiff filed his complaint, he advised that he is subject to 28 U.S.C. § 1915(g), which is correct. (*Id.* at 4, PageID.4). *See Charest v. Alabama,* 18-0297-KD-N (S.D. Ala. 2018).[2] Thus, his complaint must satisfy the exception to § 1915(g) – he is under imminent danger of serious physical injury – at the time of filing. *Medberry v. Butler,* 185 F.3d 1189, 1193 (11th Cir. 1999). Upon review, the Court concluded that an

[1] Plaintiff spelled the surname of this Defendant as "Cook." (Doc. 1 at 11, PageID.11). This Defendant's declaration reflects that the correct spelling is "Cooks." (Doc. 13-1 at 1, PageID.100, Declaration of Mary Cooks).

[2] In *Charest v. Alabama*, *supra*, which was dismissed without prejudice pursuant § 1915(g), the Court observed that Plaintiff had three actions and appeals dismissed for § 1915(g)'s qualifying reasons, namely, *Charest v. State of Alabama,* CA No. 98-1003-P-M (S.D. Ala. 1999) (frivolous); *Charest v. Montgomery,* CA No. 04-0687-BH-M (S.D. Ala. 2007) (frivolous appeal); and *Charest v. Riley,* CA No. 10-0051-MHT-SRW (M.D. Ala. 2010) (failure to state a claim). And, among the other cases previously filed by Plaintiff, two additional cases were noted as being dismissed before service on defendants: *Charest v. Mitchem*, CA No. 12-2844 (N.D. Ala. 2013) (dismissed as moot pursuant to 28 U.S.C. § 1915A), and *Charest v. Riley*, CA No. 10-0051-MHT-SRW (M.D. Ala. 2010) (dismissed pursuant to § 1915(g). Furthermore, PACER lists twenty actions as having been brought by Plaintiff.

allegation met the exception, and Plaintiff has been allowed to proceed *in forma pauperis*. (Doc. 9, PageID.85).

According to Plaintiff, between March 18, 2020 and March 23, 2020, when the CDC (Centers for Disease Control and Prevention) made announcements, he requested from Defendant Cooks and other officers a bleach disinfectant for the small (12 x 20 foot) law library. (Doc. 1 at 4, PageID.4). After a few days, Captain Knight brought a small bottle of Lysol wipes, and a few days later, she told Plaintiff to stop writing and asking for anything else.[3] (*Id.*).

Subsequently, on April 7, 2020, Plaintiff wrote a letter thanking them and asking for the "same protection" in his dorm, H-Block, but none came. (*Id.* at 5, PageID.5). He also requested hand-sanitizers be distributed during the three meals he eats with 75 to 100 other inmates. (*Id.*). In between meals, he maintains no cleaning is done to the tables, floors, and utensils that are left unattended. (*Id.*). Moreover, "ADOC (Alabama Department of Corrections) defendants" are alleged not to require six-foot distancing, as inmates congregate during meals and recreation and in their housing. (*Id.*).

 "ADOC defendants" do not test inmates who have flu-like symptoms, such as a running nose, running eyes, cramps, and fever, and inmates around him are coughing,

---

[3] Plaintiff also alleged that inmate McConico requested a typewriter and Captain Knight "screamed" for him to get six feet away from her, which was witnessed by inmate Jason Adorno. (Doc. 1 at 4, PageID.4). This typewriter allegation does not appear to be relevant to Plaintiff's claims in his complaint for protection from the COVID-19 virus. But the fact that Captain Knight was trying to enforce social distancing may be relevant.

sneezing, and smoking. (*Id.*). Because no testing is occurring and guidelines have not

been implemented, he and others are being subjected to COVID-19. (*Id.*). In his dorm,

which he shares with 75 to 125 inmates, there are no cleaning supplies to kill COVID-19

and to prevent its spread even though sick inmates are around him. (*Id.*).

For the past couple of weeks, "ADOC defendants" still allowed transfers of

inmates among prisons. (*Id.*). They also allow free-world people and officers to enter

Fountain without wearing protective gear (masks, gloves, shields), thereby subjecting

him and others to COVID-19 and placing him in imminent danger of serious physical

injury, that is, death, because he is 63-years-old and has aged-related infirmities, (which

were not identified). (*Id.* at 6, PageID.6).

"ADOC defendants" are not protecting him with sufficient supplies in order to

take care of himself considering the overcrowded conditions noted by the Department

of Justice's Report to Defendant Ivey on April 4, 2019. (*Id.* at 6-7, PageID.6-7). "ADOC

defendants" "suggest" we "practice social distancing, preventiveness, but refuse [to]

supply [him and] (others) with CDC recommended supplies (adequate soap,

disinfect[ant] spray, [and] bleaching materials[] to clean [his] living area, or tables,

benches in TV area or chow hall-during - after feeding (3 x a day)!!!" (*Id.* at 6, PageID.6).

"ADOC defendants" should issue hand-sanitizer to everyone throughout the day and

night and during meals, cleaning periods, and processing, and provide bleach, soap, and

COVID-19's disinfectant spray throughout the camp and institution in order to prevent

COVID-19's spread. (*Id.*). He requests a preliminary injunction to protect himself and others by testing before he contracts COVID-19. (*Id.* at 7, PageID.7).

Plaintiff claims he is a "sitting duck" waiting to contract COVID-19 because Fountain has active COVID-19 cases and no testing or means for Plaintiff to request testing. (*Id.* at 8, PageID.8). "ADOC defendants" are alleged to be deliberately indifferent by refusing to test and remove inmates who have shown symptoms, i.e., sick, coughing, feverish. (*Id.*). "ADOC defendants" are lying to families and the public that they are bleaching and cleaning the prison and providing COVID-19 sanitation supplies, sprays, ample soap, disinfectant, masks, and shields. (*Id.*).

Plaintiff challenges the constitutionality of 28 U.S.C. § 2244 because he contends that it violates his First and Fourteenth Amendment rights, i.e., this statute denies access to courts, is cruel and unusual punishment, and is a deprivation of his due process and equal protection rights. (*Id.* at 8-9, PageID.8-9). Section 2244 prevents him from re-filing a second habeas petition unless there is a new rule of law or he is actually innocent. (*Id.* at 9, PageID.9). He was not sentenced to death, but in light of COVID-19 and his prior medical condition and age, "ADOC defendants" are being deliberately indifferent in their efforts to protect him from it. (*Id.*). When Congress enacted § 2244, he contends that it failed to provide a remedy for relief from unconstitutional detention that is the result of a medical emergency or a public danger such as COVID-19. (*Id.*). Thus, this section deprives him of his constitutional rights arbitrarily. (*Id.* at 10,

PageID.10).[4]

As stated *supra*, the complaint's request for relief is for a declaratory judgment and a preliminary injunction for "emergency COVID-19 testing" and preventive services and supplies for the living areas and kitchen." (*Id.* at 13, PageID.13).

### B. Motion for Temporary Restraining Order or, in the Alternative, for Preliminary Injunction. (Doc. 4, PageID.24).

Almost two weeks after filing the complaint, Plaintiff filed "Emergency Notice of Imminent Danger Inside ADOC of Covid-19 Updated Facts & Cause for Public Alarm Through Amendment" on April 23, 2020, which was construed as a motion for a temporary restraining order or, in the alternative, for a preliminary injunction. (Doc. 4, PageID.24). Plaintiff's motion for a temporary restraining order (*Id.* at 2, PageID.24) was denied by District Judge Moorer. (Doc. 5, at 3, PageID.33). The motion's request for a preliminary injunction (Doc. 4 at 5, PageID.28) was then referred to the undersigned. (Doc. 14, PageID.222).

In the motion, according to Plaintiff, his friend, inmate Dave Thomas, visited Fountain's law library complaining that ADOC did not "test[] him for his preconditions [and] illness" even though COVID-19 was running rampant at ADOC. (Doc. 4 at 2, PageID.25). Subsequently, inmate Thomas was transferred from Fountain to St. Clair Correctional Facility (St. Clair) where he tested positive for COVID-19 and within twenty-

---

[4] Plaintiff signed his complaint under penalty of perjury stating that the facts are true and correct. (Doc. 1 at 13, PageID.13).

four hours died. (*Id.*). Plaintiff contends he and others at Fountain were exposed to COVID-19 by inmate Thomas. (*Id.*).

Plaintiff maintains that "ADOC defendants" are failing to conduct examinations and testing of him and others at Fountain. (*Id.*). Inmates who are sick and coughing are living within three to four feet of each other, as ADOC cannot comply with the safe-distancing requirements for COVID-19 prevention. (*Id.*). Generalized cleaning, bleaching, or disinfecting, which includes the wiping down of beds, benches, sinks, tables, and rails in the kitchen area, are not taking place. (*Id.*). Nor is social distancing taking place, as he and others are forced to be beside each other while eating, bathing, and using toilets and sinks. (*Id.*).

Plaintiff believes his age and unidentified preconditions make him susceptible to dying should COVID-19 infect him. (*Id.* at 3, PageID.26). But no reasonable care is being provided to him and to prevent the spread of COVID-19, in that no testing is occurring and no order is in place to obey the CDC guidelines. (*Id.*). By not testing in the numbers needed due to cost considerations, ADOC and its health care agents are breaching their duties. (*Id.*). That is, ADOC and Wexford are not taking reasonable steps to avoid placing his life in danger and causing a public danger to officials at the prison and to Atmore citizens. (*Id.*). And "ADOC defendants" still require inmates to fill out a sick-call slip, from which it can takes days or weeks to receive a response. (*Id.* at 4, PageID.4).

More is needed at Fountain than simply allowing him to wash his hands more

frequently. (*Id.* at 4, PageID.27). "ADOC defendants" are not wearing masks, no hand-sanitizer is being offered, and no cleaning is occurring in the units and in the kitchen between meals. (*Id.*). "ADOC defendants" are merely telling Plaintiff and others "to maintain cleanliness, but are not providing needed, adequate 'disinfect[ant]' to do so, such as [in] the living area, TV area, bathroom[,] and kitchen [which] inmates use in large numbers – throughout the day [and] night[.]" (*Id.*).

In the absence of immediate injunctive remedial relief, Plaintiff "fears" "ADOC defendants" will transfer inmates between prisons spreading COVID-19 without testing and will not quarantine inmates to prevent the spread. (*Id.* at 5, PageID.28). Thus, Plaintiff requests that transfers be stopped, there be testing and subsequent segregating of sick inmates, and "actual Covid-19 'policy-procedures'" be implemented. (*Id.*). Plaintiff requests that this action be fast-tracked due to the overall deaths associated with COVID-19, and to the dangerous environment caused by massive overcrowding and staff shortages. (*Id.*).

After his allegations, Plaintiff signed his motion. (*Id.* at 5, PageID.28). The next page is a certificate of service, which indicates it was sent to Defendant Ivey and to Commissioner Dunn and Defendant Cooks in care of ADOC's Legal Division and was signed by Plaintiff – "28 U.S.C. § 1746 – Under Oath – Penalty of Perjury so help me

Jehovah God." (*Id.* at 6, PageID.29).[5]

**C. "Emergency Facts Arising from ADOC Retaliations."** (Doc. 12, PageID.54).

Almost two weeks after Plaintiff's motion for temporary restraining order was denied (Doc. 5, PageID.223), Plaintiff filed "Emergency Facts Arising from ADOC Retaliations" (Doc. 12, PageID.54) on May 15, 2020, seeking "leave to amend ancillary claims."

In this document, Plaintiff wants ADOC to take notice of the CDC's and the Alabama Health Department's information regarding COVID-19. (*Id.*). Plaintiff asserts that enforcement under Defendant Cooks has only taken place in the law library and not elsewhere at Fountain, even though conditions are overcrowded, and bunk beds are in close proximity to each other. (*Id.*). "Defendants" have not created space to provide for social distancing; for example, bunkbeds are approximately two feet apart. (*Id.* at 2, PageID.55). In his dorm where 151 inmates live two feet apart, inmates are coughing

---

[5] If Plaintiff's intention was to sign his motion under penalty of perjury, he did not accomplish this because 28 U.S.C. § 1746 requires: "I declare (or certify, verify, or state) under penalty of perjury *that the foregoing is true and correct.* Executed on (date). (Signature)." *Id.* (emphasis added). *See Rogers v. City of Selma,* 178 F. Supp.3d 1222, 1233 (S.D. Ala. 2016) (holding the affidavits merely indicated that the affiants acknowledged before a notary who they were and would not be considered on summary judgment because the witnesses did not declare their statements to be true); *see also U.S. v. Roberts,* 308 F.3d 1147, 1154-55 (11th Cir. 2002) (the court affirmed appellant's conviction for perjury finding that his declaration's language that it was made "under penalty of perjury 28 U.S.C. § 1746 . . .that everything written herein is correct and true to the best of my knowledge and belief" sufficiently complied with making a statement under penalty of perjury as required under 18 U.S.C. § 1621(2) and 28 U.S.C. § 1746, and found he clearly intended to submit a sworn declaration subject to penalty of perjury).

and sneezing and are protecting themselves by hanging sheets between bunk beds. (*Id.*).  And most guards refuse to wear masks, which is deliberate indifference to CDC guidelines.  (*Id.*).

In the dining hall, "Defendants" have spray painted "Xs" on the floor, which at best are three to four feet apart, so inmates will separate themselves. (*Id.* at 3, PageID.56). The dining hall has 36 tables, each with a square metal top with 4 seats attached, and has a seating capacity of 144 inmates, which is not in compliance with the CDC guidelines for social distancing. (*Id.*). In the hallway used by inmates for the snack line and weekly canteen, and for access to the dining hall, law library, hobby shop, mail room, health care unit, business offices, trade school, SAP treatment classes, visitation yard, classification office, and the PREA captain's office, inmates stand shoulder-to-shoulder, pressed against the wall on one-side, because Defendant Cooks said it is too crowded to space inmates and takes too long to serve meals three times a day and to conduct canteen. (*Id.*; *see* Ex. A, hand-drawn diagram).

Plaintiff complains that his First and Fourteenth Amendment rights are being chilled by Defendant Mary Cooks and Captain Langham when they forced Plaintiff and other inmates out of the law library on May 6, 2020, because two inmates who picked up forms were not wearing masks. (*Id*. at 4, PageID.57). The preceding day, Defendant Cooks had come into the small law library and said, "What ya'll doing in here filing all that paperwork on us . . . ya'll ain't six (6) feet apart[.]" (*Id.*). Plaintiff maintains that it is

not his responsibility, nor the other clerks', to enforce mask-wearing or social-distancing, which is impossible because every area at Fountain is overcrowded. (*Id.*). That is, there are over 1,000 inmates at Fountain, which is over 170 percent capacity. (*Id.*). And Plaintiff claims that he has a "substantive ancillary challenge" pending before U.S. Supreme Court on a petition for the writ of certiorari in *Charest v. Judge Clark Stankoski*, which he has until May 20, 2020 to answer or waive filing. (*Id.* at 5, PageID.58). He maintains that his litigation is meritorious on its face and he needs adequate time to prepare. (*Id.* at 5-6, PageID.58-59). He alleges that their conduct is arbitrary and capricious, and this latest retaliation violates his right of access, to assemble, to redress, and to grieve. (*Id.*). Because he mentioned in his complaint that "John-Jane Doe[]s" could come forth, Plaintiff wants to add Captain Sharon Langham as a Defendant for closing the law library because masks were not being worn and safe-distancing was not being adhered to, even though Plaintiff was wearing a mask, and social distancing cannot exist in the law library. (*Id.* at 6, PageID.59; *see* Doc. 1 at 12, PageID.12 – "John-Jane Doe et al., to be supplementally [sic] amended when, if relevant forthwith"; *see* Exs. B, C (hand-drawn diagrams of the law library). Plaintiff asserts that Langham's act was a denial of access to courts and retaliation, and for the Court to order her to cease and desist. (*Id.*). Because the CDC and Alabama Health directives only allow crowds of not more than seven to ten, the number of inmates that were in the law library was less than the maximum. (*Id.* at 7, PageID.60). Plaintiff argues that

"[n]o rational reasonable penological interest exists for closing FCC's law library – when social distancing cannot be done in the dorms, kitchen, hallways, hobby shop, and health care clinic[.]" (*Id.* at 10, PageID.63).

In addition, Plaintiff claims that he has pending litigation before Judge Ott, 2:19-MC-03852-JEO, for past retaliation by the same defendants for transferring him in an attempt to moot his claims. (*Id.* at 9, PageID.62). He seeks protection from "Defendants" from doing the same. (*Id.* at 9-10, PageID.62-63).

For relief, Plaintiff requests testing for COVID-19 and isolating for treatment those with COVID-19, issuing masks to everyone, making available hand-sanitizer and/or soap disinfectant in dorms, and taking steps to reduce areas where groups of over ten inmates congregate. (*Id.* at 8, PageID.61). In the absence of injunctive relief issuing, Plaintiff contends that he is subject to contracting COVID-19 and being threatened and harassed by Defendant Cooks and Captain Langham for reporting constitutional violations. (*Id.*). And, if "ADOC defendants" do not institute CDC and Alabama Health Department recommended mandates, irreparable injury or harm will occur, as social distancing cannot occur in the overcrowded living conditions in the dorms statewide where COVID-19 is spreading as shown by inmate Thomas's death. (*Id.*).

In the certificate of service, signed under 28 U.S.C. § 1746, but without an acknowledgement of correctness and truthfulness, Plaintiff states a copy was sent to the

Alabama Attorney General and ADOC's Legal Division. (*Id.* at 11, PageID.64).

### D. Defendants' Response in Opposition to Plaintiff's Motion for Preliminary Injunction. (Doc. 13, PageID.70).

Defendants Governor Ivey and Warden Mary Cooks[6] filed their response in their official capacity, inasmuch as Plaintiff did not identify the capacity and because he seeks declaratory and injunctive relief. (Doc. 13 at 1 n.1, PageID.70 n.1). Defendants further bring to the Court's attention that previously Plaintiff has been barred by § 1915(g) and asks for reconsideration of its finding that Plaintiff met his burden of showing imminent danger of physical harm in light of the facts that Plaintiff "is not particularly vulnerable, that he had no contact with another inmate who had COVID-19, that Fountain has responded vigorously to mitigate COVID-19 risks, and that no Fountain inmates or staff have contracted the virus." (*Id.* at 2 n.2, PageID.71 n.2).

At the beginning of their response, Defendants advise:

> First, [Plaintiff] is not an inmate with particular vulnerabilities to the effects of COVID-19. Second, there is no evidence that [Plaintiff] had contact with any inmate infected with COVID-19. Third, the efforts of the Alabama Department of Corrections and its health care vendor, Wexford Health Sources, Inc., to prepare for, prevent, and manage COVID-19 at Fountain (and across the ADOC system) were well-planned, well-executed, well-documented, and undeniably

---

[6] Defendant Cooks has been Fountain's warden for two years and has been employed for thirty years with the Alabama Department of Corrections. (Doc. 13-1 at 102 ¶2, PageID.1-2). As Fountain's warden, she manages and oversees Fountain's daily activities, such as "the supervision of staff and inmates, protecting the safety and security of the facility, managing program administration." (*Id.*). She is a part of the Fountain's Pandemic Planning Team, along with the Health Service Administrator, Facility Medical Director, and the Regional Associate Director of Health Services. (*Id.*).

successful. *As a result of these efforts by administrative, correctional, medical, and mental-health staff at Fountain, no inmate or staff member has tested positive for COVID-19.*

(*Id.* at 2-3, PageID.71-72) (emphasis added).

Attached to Defendants' response are the declarations under penalty of perjury of Defendant Mary Cooks, Associate Commissioner for Health Services for the Alabama Department of Corrections Ruth Naglich,[7] and Dr. Hugh Hood.[8]

### 1. Plaintiff's Health and Alleged Exposure to COVID-19.

According to the CDC, persons currently "identified at a higher risk of severe illness from COVID-19 . . . include persons over sixty-five (65) years of age or with serious underlying medical conditions such as chronic lung disease, serious heart conditions, immunocompromised, severe obesity, diabetes, chronic kidney disease undergoing dialysis, and liver disease." (Doc. 13-3 at 4 ¶6, PageID.214, Dr. Hood's Decl.).

---

[7] Ms. Naglich has been employed in this position since October 4, 2004. (Doc. 13-2 at 1 ¶2, PageID.131, Naglich Decl) In this capacity, she supervises the employees of ADOC's Office of Health Services (OHS). (*Id.*). She also monitors the delivery of medical and mental health care by Wexford Health Services, Inc. (Wexford), which entails promulgating administrative policies and procedures related to ADOC's delivery system for medical and mental-health care, overseeing ADOC's compliance with legal and administrative requirements concerning medical and mental-health care such as the intake and housing of new and existing inmates, and monitoring the medical and mental-health care systems at ADOC facilities. (*Id.* at 2-3 ¶4, PageID.132-133).

[8] Dr. Hood, since 2007, has been the Associate Regional Medical Director or Physician Director for the prior medical provider and the present medical services vendor, Wexford. (Doc. 13-3 at 2-3 ¶2, PageID.211-12, Dr. Hood's Decl.). He has been licensed to practice medicine in Alabama since 1975, and is generally familiar with Plaintiff and inmate D.T., *see infra.* (*Id.* at 3 ¶3, PageID.212).

Dr. Hood states, "Plaintiff is not sixty-five (65) years or older and does not have the illnesses recognized by the CDC as placing a person in high risk for a severe illness from COVID-19."[9] (*Id.* at 4-5, ¶6, PageID.214-215; *see* Doc. 13-2 at 60, PageID.190, Naglich's Decl., Ex. 6, Plaintiff's y.o.b.).

With regard to the inmate who was transferred from Fountain and to whom Plaintiff refers, Defendants identified him as D.T. for privacy reasons. (Doc. 13-3 at 2 ¶3, PageID.212). According to Dr. Hood, he has examined the medical records and movement histories of Plaintiff and D.T., declarations of ADOC's Associat[e] Commissioner of Health Services, Ruth Naglich, and Warden Mary Cooks, and Plaintiff's "Emergency Motion" and complaint, and has concluded unequivocally that Plaintiff is misinformed and has misrepresented "his purported exposure to COVID-19 and the prevention and management of COVID-19 at Fountain." (*Id.*). As of May 8, 2020, not a single inmate at Fountain had tested positive for COVID-19. (*Id.* at 3 ¶3, PageID.213). (*Accord* Doc. 13-1 at 2-3 ¶¶3-4, PageID.101-102, Cooks Decl.; Doc. 13-2 at 11 ¶¶17-18, PageID.141-142, Naglich Decl.).

Since February 2019, Plaintiff was housed in H1-41 at Fountain. (Doc. 13-3 at 3 ¶4, PageID.213). From October 16, 2019 until March 23, 2020, D.T. was housed in a different dorm at Fountain, I1-38-A. (*Id.*). D.T., who suffered from multiple myeloma

---

[9] Plaintiff is noted by Ms. Naglich as having refused pneumonia and influenza vaccines during the past year and having failed to report to three scheduled chronic care visits during March and April 2020. (Doc. 13-2 at 11 ¶17, PageID.141).

and renal failure, left Fountain on March 23, 2020, for medical care at Atmore

Community Hospital. (*Id.* at 2-3 ¶¶3-4, PageID.212-213; *accord* Plaintiff's and D.T.'s

movement histories, Doc. 13-1 at 9-29, PageID.108-128; Doc. 13-2 at 60-80, PageID.190-

210). (Since early March 2020, ADOC "has not transferred inmates among or outside of

facilities except for urgent or emergent [sic] medical services or security concerns. D.T.'s

cancer treatment and other medical services fit this exception." Doc. 13-3 at 3 ¶4,

PageID.213)).

Ten days after arriving at Atmore Community Hospital on March 23, 2020, D.T.

was transferred because his doctors wanted more advanced services for him. (*Id.* at 3

¶5, PageID.213). ADOC arranged for his admission to Brookwood Baptist Health

(Brookwood) in Birmingham, Alabama, which required D.T. wait for admission for twenty

hours in St. Clair's healthcare unit. (*Id.*). At St. Clair, D.T. did not present with COVID-19

symptoms. (*Id.*). After D.T. was transferred to Brookwood on April 4, 2020, he was

tested for and diagnosed with COVID-19. (*Id.*). D.T. was at Brookwood for twelve days.

(Doc. 13-2 at 12 ¶18, PageID.142, Naglich's Decl.). According to Dr. Hood, D.T.'s terminal

medical conditions caused his death, not COVID-19. (Doc. 13-3 at 3 ¶5, PageID.213; *see*

*also* Doc. 13-2 at 2 ¶3, PageID.132 "D.T. died of cardiac arrest subsequent to multiple

myeloma and renal failure"). "DT contracted COVID-19 while hospitalized outside any

ADOC facility – a common source of COVID-19 infections[, which is] why non-essential

medical services outside ADOC facilities were suspended." (Doc. 13-3 at 3-4 ¶5,

PageID.213-214; Doc. 13-2 at 12 ¶18, PageID.142). Moreover, the symptoms that D.T. experienced at Fountain as described by Plaintiff, namely, "shortness of breath, cough, fever, [and] abdominal pain," "are consistent with his terminal medical conditions." (Doc. 13-3 at 3-4 ¶5, PageID.213-214) (brackets in original). During the period of time D.T. was infected with COVID-19, no person living or working at Fountain, including Plaintiff, was exposed by D.T. to COVID-19. (*Id.*).

Dr. Hood further advises, "Plaintiff is not a person with symptoms of COVID-19 [and], [f]rom a clinical perspective, . . . is not at risk of contracting COVID-19 or any problems associated with COVID-19." (*Id.* at 9 ¶10, PageID.219). Thus, "Plaintiff is neither a high priority nor a priority for COVID-19 testing under CDC guidance." (*Id.*). However, if Plaintiff or another Fountain inmate becomes symptomatic or a testing priority, that inmate will receive testing and, if a positive test results, will be medically isolated and have his healthcare appropriately managed. (*Id.*). "That is, and has been, the practice at Fountain and other ADOC facilities." (*Id.*).

### 2. ADOC's Response to COVID-19.

According to Ms. Naglich, ADOC typically proactively prepares for infectious diseases in its intake process, but with the realization of the magnitude of the pandemic spreading to the United States, ADOC realized the uniqueness of the situation presented. (Doc. 13-2 at 5 ¶8, Page ID.135). ADOC began planning early in March 2020 for COVID-19. (*Id.* at 3 ¶6, PageID.133). At the facility level, ADOC and Wexford created

17

Pandemic Planning Teams that included the Warden, Health Service Administrator, OHS Regional Associate Director of Health Services, Medical Director of the facility, and others such as the Facility Food Service Manager and Facility Maintenance. (*Id.* at 4-5 ¶6, PageID.134-135). Its planning entailed assessing the levels of correctional and medical staff needed; determining locations for quarantining inmates; evaluating supplies of personal protection equipment, soap, paper towels, disinfectants, and food; and educating staff and inmates about the signs and symptoms of COVID-19. (*Id.*). On March 23, 2020, CDC issued "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-2019) in Correctional and Detention Centers" (CDC Guidance) that contained guiding principles for prisons, which Naglich attached as Exhibit 1. (*Id.* at 4 ¶7, PageID.134; *Id.* at 14-39, PageID.144-169). ADOC provided education about COVID-19 to persons living and working in the ADOC's facilities, and ADOC posted in its facilities, including Fountain, documents from OHS and CDC explaining signs and symptoms of COVID-19, what to do if you have them, proper hygiene and other preventive practices, and how to address stress associated with COVID-19, which are attached as Exhibit 2. (*Id.* at 5 ¶8, PageID.135; *see Id.* at 41-48, PageID.171-179, Ex. 2, Naglich Decl.).

Acting on CDC's Guidance, and after consulting with the Alabama State Health Officer, ADOC quit receiving new intakes and closed it facilities to all outside visitors to avoid the introduction and spread of COVID-19 into the ADOC system. (*Id.* at 5-6 ¶9,

PageID.135-136). On March 20, 2020, Commissioner Dunn announced a 30-day moratorium on taking in new inmates to ADOC's system, with one exception for state inmates with severe medical conditions, who would be approved on a case-by-case basis by OHS, which includes Naglich. (*Id.* at 6 ¶9, PageID.136).

With regard to staff, ADOC began screening staff upon arrival for work or when they called in sick. (*Id.* at 6 ¶10, PageID.136). Employees who reported for work had a temperature check and questionnaire to which to respond. (*Id.*). And, for sick employees, ADOC began a tracking log and a questionnaire to determine when an employee may return to work. (*Id.*; *see Id.* at 49, PageID.179, Ex.3 (screening questions and log)).

Cleaning instructions were provided by ADOC, which included a checklist for the kitchen, which is attached as Exhibit 4. (*Id.* at 6 ¶10, PageID.136; *see Id.* at 54, PageID.184). And the facilities are also reviewed by ADOC for compliance. (*Id.*).

Facemasks were offered to inmates and persons working at the facilities, and written directions for their proper use, storage, removal and cleaning were provided. (*Id.*). Written acknowledgements or rejections for the facemasks were obtained. (*Id.* at 6-7 ¶12, PageID.136-137; *Id.* at 57, PageID.187, Ex. 5). Plaintiff accepted a mask, as reflected by his signed acknowledgement. (Doc. 13-1 at 31, PageID.130, Ex. C).

During the thirty-day moratorium, a new intake process was developed and implemented on April 21, 2020, for all inmates, except maximum security inmates, with

19

intake for male inmates being at Draper Correctional Facility and intake for females

being at a satellite facility near Julia Tutwiler Prison for Women (Tutwiler). (*Id.* at 7 ¶13,

PageID.137). This pilot program was developed to protect the existing inmate

population and to be consistent with CDC Guidance; the new intakes are quarantined

for fourteen days before they are transferred to Kilby Correctional Facility or Tutwiler to

complete the intake process, assuming an inmate has no signs or symptoms of COVID-

19 or tests positive for it. (*Id.* at 7, ¶¶13-14, PageID.137). At the conclusion of pilot

program, ADOC will evaluate continuing, changing, or terminating it. (*Id.* at 8 ¶14,

PageID.138). Depending on the conclusion, the possibility exists for the reinstitution of

the moratorium on intakes from county jails. (*Id.*).

ADOC inmates will continue to receive appropriate medical care with respect to

prevention and management of COVID-19. (*Id.* at 8 ¶15, PageID.138). As result of

ADOC's and its medical contractor's staff's continued work to prevent the introduction

and spread of COVID-19, the instances of COVID-19 in the ADOC system have been few

as of May 8, 2020. (*Id.*). Specifically, two inmates who tested positive for COVID-19 did

so after frequent or lengthy hospital visits and were quarantined, and five inmates who

previously tested positive for COVID-19 recovered, but none of these inmates who

tested positive were at Fountain. (*Id.).* ADOC placed strict limits on inmate movement

in and out of the system because when a COVID-19 inmate is medically quarantined,

additional bed space is lost to protect other inmates from exposure. (*Id.* at 8-9 ¶15,

PageID.138-139).

Naglich, as Associate Commissioner for Health Services, participates in and oversees "the preparation, prevention, and management efforts associated with COVID-19 within the ADOC. System." (*Id.* at 9 ¶16, PageID.139). She relates the following prevention and management measures have been taken by ADOC and Wexford:

a.  Educating inmates and staff through oral and written communication, including signage, about symptoms of COVID-19, proper hygiene practices, and social distancing;

b.  Encouraging inmates and staff to engage in proper hygiene practices and social distancing;

c.  Providing and restocking antibacterial soap in bathrooms and housing areas and hand sanitizer in main hallways and dining areas to allow frequent hand-washing, [but not in housing units and recreational areas due to the potential for misuse in creating drinking alcohol];

d.  Continuing medical appointments such as chronic care clinics and sick-call appointments;

e.  Suspending copays for inmates seeking medical services;

f.  Implementing intensified cleaning and disinfecting procedures;

g.  Auditing the cleaning and disinfecting of the facility;

h.  Suspending the intake of new inmates and, when restarted, ensuring an appropriate quarantine and screening before transferring the new intakes from a temporary intake facility to a permanent intake facility, as noted above;

i.  Performing verbal screening and temperature checks for all person entering the facility and, if a person has a temperature over 100.4 degrees Fahrenheit or other symptoms of COVID-19, denying the person entry into the facility;

j.  Implementing social distancing strategies;

k.  Providing two (2) masks to each inmate, along with instructions on wearing, cleaning, and caring for the masks;

21

l.       Providing masks and gloves to administrative and correctional staff, along with instructions on wearing, cleaning, and caring for the masks;

m.       Providing personal protective equipment, including masks and gloves, to medical and mental-health staff, along with instruction on wearing, cleaning, and caring for the masks;

n.       Suspending interfacility transfers of inmates within the ADOC system, except for essential medical services or serious security threats;

o.       Implementing a quarantine or medical isolation plan for any inmate or staff who tests positive for COVID-19 or is suspected of having or being exposed to COVID-19;

p.       Monitoring inmates for symptoms of COVID-19 such as cough and shortness of breath or at least two (2) of fever, chills, repeated shaking with chills, muscle pain, headache, sore throat, and new loss of taste or smell; and

q.       Testing inmates for COVID-19 with symptoms of COVID-19 or contact with a person testing positive for or suspected of having COVID-19.

(*Id.* at 9-10 ¶16, PageID.139-140; *see* Doc. 13-1 at 4-5 ¶5, PageID.103-104; Doc. 13-3 at 5-6 ¶7, PageID.215-216). According to Naglich, she, ADOC, and Wexford "continue to evaluate the COVID-19 prevention and management measures [and they] will implement new or different prevention and management measures if and when necessary and consistent with CDC and other guidance." (Doc. 13-2 at 10, PageID.140; *see also Id.* at 14, PageID.144, Ex. 1, "The US Centers for Disease Control and Prevention (CDC) will update this guidance as needed and as additional information becomes available.").

In Defendant Cooks' declaration, she details how institutional cleaning for

COVID-19 at Fountain occurs. (Doc. 13-1 at 5-6 ¶6, PageID.104-105).

> A team consisting of a Captain and two (2) to three (3) inmates clean and disinfect surfaces and objects that are frequently touched, especially in common areas, such as plumbing fixtures (i.e., toilets, sinks, etc.), countertops, bed frames (if requested by an inmate), telephones, recreational equipment, and the like. Cleaning teams are deployed every two (2) to three (3) hours between 7 a.m. and 12 a.m. each day. Similarly, inmate bedding and clothing [are] routinely laundered, kitchen appliances, utensils, and cookware [are] routinely washed between meals, and the facility is routinely cleaned. A nutritionist at Fountain audits the cleaning and disinfecting practices at Fountain to ensure they are timely completed and, if a team[] fails to timely complete and report a cleaning and disinfection obligation, the nutritionist informs [her] and other supervisory staff and we ensure the sanitation process is completed immediately. Additionally, the completion of a cleaning and disinfecting session is reported to ADOC's Central Office for supplemental oversight.

(*Id.*).

Defendant Cooks further advises that in each housing unit are located, almost all day and night, one or two staff members who are trained in COVID-19 symptoms, who report their concerns of an inmate displaying symptoms, and who are available to address any concerns an inmate may have. (*Id.* at 6 ¶7, PageID.105). She is unaware of Plaintiff expressing any concerns about COVID-19 to a correctional officer. (*Id.*). She denies that she "failed or refused to protect Plaintiff or any other Fountain inmate from COVID-19, to provide preventative supplies such as antibacterial soap or hand sanitizer (at the appropriate locations), or to take reasonable steps to prevent and manage

23

COVID-19 in Fountain." (*Id.* at 7 ¶8, PageID.106). However, healthcare decisions concerning screening, testing, diagnosing, managing, and treating inmates at Fountain are made by Wexford, ADOC's health-care vendor. (*Id.*).

According to Naglich, Plaintiff did not turn in a sick-call request connected to COVID-19, nor did he file a grievance for the denial of COVID-19 related medical services. (Doc. 13-2 at 11 ¶17, PageID.141). She adds that sick-call requests are triaged and are timely addressed depending on their nature. (*Id.*).

### E. Plaintiff's Request for Access to Courts – Absent Retaliations (Doc. 15, PageID.223).

In this filing, Plaintiff requests the Court to revisit its "grant T.R.O. – P.I." (Doc. 15 at 1, PageID. 223). Then, in conclusion, he asks the Court to revisit its "earlier TRO denial, partial grant for PI, to enjoin def's Cook and Langham [] from 'future, further impediments, retaliations, threats, transfers, disciplinaries, citations" [] in response to filing this § 1983 protective declaration – injunctive request." (*Id.* at 9, PageID.231).

To review what has transpired, District Judge Moorer denied Plaintiff's motion for a temporary restraining order[10] and referred the motion for a preliminary injunction to the undersigned. (Doc. 5 at 2, PageID.32). The motion for preliminary injunction was

---

[10] The undersigned points out that a temporary restraining order expires 14 days, or less, after its entry, unless good cause is shown to the court. FED.R.CIV.P. 65(b)(2). And Rule 65(b) provides for the issuance of a temporary restraining order when the adverse party has *not* received notice of the motion. Here, the adverse parties have responded, which is required for entry of preliminary injunction. FED.R.CIV.P. 65(a).

not granted in District Judge Moorer's order and is now before the Court pursuant to District Judge Moorer's referral. (Doc. 14, PageID.222).

In his filing, Plaintiff begins by requesting additional time to adequately review Defendants' response due to the response's volume. (Doc. 15 at 1, PageID.223). He complains that he is being retaliated against with verbal threats of sanctions and transfer for reporting the "imminent public danger" to the Court based on overcrowding conditions. (*Id.*). He seeks to enjoin Defendant Cooks and Langham from "further threats, intimidation, retaliation, overt disciplinaries, or citations" and transfers for filing this § 1983 action. (*Id.* at 2, 9, PageID.224, 231). According to Plaintiff on May 19, 2020, at 1 p.m., two inmates without passes were in Fountain's law library; when previously at 9 a.m., Langham told Plaintiff and inmate McConico "no pass – no access." (*Id.*). When the two inmates without passes were brought to Langham's attention by the law clerks, she said that it was okay. (*Id.*). Plaintiff claims to remain under extreme duress and fear of death from the COVID-19 crisis "if -when it strikes inside ADOC – absent federal review, P.I. for 'testing' and protection of retaliation – above[.]" (*Id.* at 3, PageID.225). So, Plaintiff is working from the floor in his dorm. (*Id.*).

Plaintiff claims to have an expert witness, Dr. Michael Puisis, who has sent him data, information, and a declaration "outlining [Plaintiff's] imminent danger theory – ongoing inside ADOC – statewide, which has to be properly reviewed and briefed, exhibited, but can't at present because of deni[al] [of] access to courts[.]" (*Id.*). Dr.

25

Puisis, he claims, is known to ADOC through *Braggs v. Dunn*, 2:14-cv-00601-MHT-JTA,

filed June 17, 2014. (*Id.* at 4, PageID.226). Plaintiff states that he adopts pleadings from

his arbitration case, No. 2:19-mc-03852-JEO, which is connected to *Braggs v. Dunn*.[11]

(*Id.*). Then, he alleges in an unclear manner "his increase as a result of breathing

problems; elsewhere [sic] - cause his precondition to be similar to 'D.T.' recent death."

(*Id.*). Because of his arbitration case, he claims he needs immediate protection from

Defendant Cooks' and Langham's retaliatory actions in light of the COVID-19 crisis, as

his constitutional rights are being chilled. (*Id.* at 5, PageID.227).

With respect to Dr. Puisis, Plaintiff claims because he is a medical expert in

*Braggs*, he is qualified to give evidence in the present case. (*Id.*). Plaintiff maintains that

---

[11] In an effort to ascertain Plaintiff's physical condition, the Court briefly examined the docket in *Braggs, supra*, which is something that it would not ordinarily undertake. In the future, if Plaintiff wants the Court to have information before it, Plaintiff must place the information before the Court by writing down the information in his filing *and* explaining its relevance in clear and concrete terms to his claims, motion, or filing. The reference to other cases, filings, or documents that are contained in his present filings in this action will not be examined by the Court. Furthermore, the use of specific facts, rather than vague allegations and legal conclusions, would assist Plaintiff in advancing his claim and in the Court's and defendants' understanding of his claim.

In reviewing the docket sheet in *Braggs* for this limited purpose, the Court found that Plaintiff filed a request for arbitration on January 16, 2019. (Doc. 2264). Attached to his request is a lengthy statement in which he complains about the lack of physical therapy for his lower right leg where surgery was performed to remove a cancerous tumor. (Doc. 2264-1 at 5). He was left with loss of the use of his foot, severe numbness, nerve damage and a limp, causing him to use a cane for life. (*Id.* at 2, 5). He sought an accommodation for his limitation. (*Id.* at 12). Subsequently, Plaintiff filed a motion to intervene on December 6, 2019 (Doc. 2680), which was denied on December 9, 2019. (Doc. 2684). The supporting documentation in Charest's arbitration case, 2:19-mc-0352-MHT-JTA, indicates that medical treatment for his leg occurred on December 4, 2014. (Doc. 1-1 at 6).

he will produce Dr. Puisis' testimony and that Dr. Puisis has testified, "[C]urrent CDC recommendations for social distancing, frequent handwashing *measures*, are only measures to protect against infection, [but] not possible in Alabama [prisons]." (*Id.* at 6, Page.228). Dr. Puisis continues, "Jails – prisons are breeding grounds for infectious respiratory illness, tuberculous (TB) is a bacteria[,] which is [sign]ificantly less transmissible than COVID-19 – yet has been responsible for numerous outbreaks of illnesses in prisons [and] jails over the years." (*Id.* at 7, PageID.229). He adds, "Respiratory infectious disease like TB are thought to be worse in prisons because of crowding and recirculated air . . . CDC still recommends screening for this condition in prisons." (*Id.*). Dr. Puisis elaborated that persons over 65 years of age and with an immune system impairment may have a higher probability of death. (*Id.*).

Plaintiff signed this document under penalty of perjury, but again Plaintiff did not acknowledge the truthfulness and correctness of his allegations. (*Id.* at 9-10, PageID.231-232). Plaintiff also attached declarations from by him, inmate Jason Adomo, and inmate James McConico, which were signed under penalty of perjury but without an acknowledgement to the correctness and truthfulness of the information by the declarant. (*Id.* at 11-13, PageID.233-235). These declarations concern the temporary closing of the law library at the beginning of the pandemic and then its restricted reopening as it concerns the number of persons having access at one time and its reduced hours. (*Id.*). It is alleged that the same social distancing is not occurring in

other areas of Fountain. (*Id.*).

**F. Reply to Defendants' Opposition for Preliminary Injunction (Reply).** (Doc. 16, PageID.237).

In his reply, Plaintiff takes issue with several of Defendants' representations. His reply is signed "under Penalty of Perjury so help me Jehovah God," without him acknowledging his reply's correctness or truthfulness. (*Id.* at 41, PageID.277). Attached to his reply is the "declaration of Patrick Joseph Charest appearing in pro per," which is executed in the same manner but with the addition of a notary public's seal and signature. (Doc. 16-1 at 9, PageID.292). Also, attached is the "declaration of Dr. Michael Puisis concerning the risk of the spread of COVID-19 in the Alabama prison system," which is simply signed by the doctor. (Doc. 16 at 46, PageID.282).

Plaintiff's reply contains much repetition within itself, and of the information in Dr. Puisis's declaration and plaintiff's declaration. To begin, Plaintiff disputes Defendants' representation that he is suing them in their official capacity alone and cites to *Lewis v. Clarke*, 137 S.Ct. 1285 (2017). (*Id.* at 1, PageID.46). He also asserts that ADOC has no internal grievance procedure that is created by administrative regulation or practice, which is contrary to Defendants' position. (*Id.* at 3, PageID.239).

Plaintiff states that he filed this action on April 10, 2020 because a case of COVID-19 was confirmed in Madison County, Alabama, on March 17, 2020. (*Id.* at 2, PageID.238). He was seeking active protection, which the public and other states'

prisons have, from Defendants who were not responding and not doing anything other than "lip-service of washing our hands more frequently," even though early on the CDC announced preventive guidelines for soap, disinfectant, masks, oral communication, and educational information. (*Id.* at 2-3, PageID.46-47). But there was a lapse of 30 to 40 days before ADOC acted, which is when he received his mask on April 16, 2020, and is after they received electronic notice of his lawsuit. (*Id.* at 3, 7, PageID.239, 243). Also, as a result of the notice, disinfectant soap bottles were installed in dormitories and bathrooms, along with the law library receiving a bottle to wipe down tables, chairs, and computers. (*Id.* at 10, PageID.246). Plaintiff revisits his prior allegations concerning inmate D.T., which he now connects to information in Defendants' response, to re-assert that there was a danger at Fountain, and it is still there. (*Id.* at, PageID.47).

In the section titled "disputed facts," Plaintiff alleges that contrary to Defendants' declarations, his diagrams prove that social distancing is impossible within ADOC's prisons, and, thus, something more than more frequent handwashing was needed. (*Id.* at 9, PageID.245). He challenges the assertion that ADOC was planning and implementing its response to the pandemic, and he continues that COVID-19 threat remains real and imminent based on the CDC Guidance, which is contrary to Defendants' position that the threat is "fictional." (*Id.* at 10, PageID.246). Regarding the cleaning teams described by Defendant Cooks, two inmates from the painting crew walk through mid-morning to each dorm's bathroom spraying toilets, urinals, and sinks with

an aerosol and at times there is a "liquid formula"; initially, they were accompanied by Captain Knight, but they no longer are. (*Id.* at 11, PageID.46). Neither are two teams rounding, nor is there auditing by a nutritionist, and a copy of an audit was not produced by Defendants. (*Id.* at 13-14, PageID.249-50). Plaintiff contends that this is a part of an "elaborate tactical scheme [by Defendant Cooks] to deflect [from] their negligent acts, and overt omissions of carrying out daily the real CDC recommendations." (*Id.* at 13, PageID.249). Moreover, the declarations do not mention the cleaning/disinfecting of handrails, walls that are leaned on, and tops of the stainless-steel dining tables, and social distancing while eating. (*Id.*). Furthermore, the disinfecting of countertops, bedframes, telephones, recreational equipment, and other frequently touched areas is not occurring. (*Id.*). He also mentions that the cleaning of the kitchen after hours is inept. (*Id.* at 18, PageID.254).

At this point in his reply, Plaintiff adopts the declaration of Dr. Michael Puisis, which is attached as exhibit A, and he reiterates information contained in Dr. Puisis' declaration. (*Id.* at 14, PageID.250*)*. Briefly, Plaintiff restates Dr. Puisis' background, which includes thirty-five years in correctional medicine, retention as an expert by federal courts, and participating in the revision of the tuberculosis standard for the CDC, and Plaintiff relates that as a medical expert in *Braggs v. Dunn*, he was "retained to assess and opine on the medical care provided to incarcerated people in ADOC custody[, which] included; review of adequacy of housing units, inspections of medical

30

clinics, equipment, supplies and sanitations; and monitoring functions related to infectious and contagious disease[s]." (*Id.* at 14-15, PageID.250-51). Plaintiff incorporates from Dr. Puisis' declaration that "COVID 19 is transmitted by droplets of infected aerosol when people with the infection speak[,] cough, sneeze and breathe. Droplets of [one's] respiratory secretions infected with virus can survive as an aerosol for up to three hours." (*Id.* at 16, PageID.252, second brackets in original). Dr. Puisis conveys that transmission occurs from inhalation due to close proximity and from hands touching contaminated surfaces and then touching the mucous membranes of the mouth, nose, or eyes. (*Id.* at 17, PageID.253). This indicates to Plaintiff that ADOC's measures are inadequate, particularly in light of Naglich's information concerning the seven inmates at other ADOC institutions who have had COVID-19. (*Id.*). He advises that Fountain's video cameras can verify disputed facts. (*Id.*).

Dr. Puisis counsels that "medical care for COVID-19 focuses on prevention, which emphasizes social distancing, handwashing and respiratory hygiene," which is not possible in Alabama's prisons. (*Id.* at 18, PageID.46). He adds that prevention is considerably more problematic in prison than in a community and ADOC does not have a "functional infection control program" with a designated staff. (*Id.* at 19, PageID.19). Two outbreaks of tuberculosis at ADOC since 2010 were mentioned by him. (*Id.*). He notes that the average occupancy rate at most ADOC facilities is 170.4% of design capacity. (*Id.* at 21, PageID.46). People who are more susceptible to COVID-19 are an

older person due to impaired immunity from aging even though younger people with hypertension may have an "unappreciated risk for severe disease," which implicates prisons because they have a high rate of hypertension. (*Id.*). In addition, in his opinion, inmates with mental illness are at an increased risk because they may not comprehend social distancing and hand hygiene and be able to communicate symptoms. (*Id.*).

Plaintiff's section titled "argument" repeats many of his reply's preceding arguments. He adds, however, that half of Fountain's inmates are functionally illiterate so education of COVID-19 preventions merely through the newsletter containing handwashing drawings was ineffectual. (*Id.* at 23, PageID.259). Many times, the newsletter is never seen because mentally ill inmates use it for scrap paper or by others for drawing or domino scores. (*Id.* at 24, PageID.47, Doc. 16-1 at 4, PageID.287). He maintains communication has not been occurring as represented, particularly orally and through signage. (Doc. 16 at 24, PageID.47). In addition to receiving a mask on April 16, 2020, one bar of soap was passed out on May 18 or 22, 2020 by Captain Knight. (*Id.* at 25, PageID.261). No inmate testing has occurred at Fountain despite CDC admonitions that the public at large will not know who is safe and who has come in contact with COVID-19 because 35% of tested people had antibodies indicating exposure to COVID-19 of which they were unaware. (*Id.* at 26, PageID.262). No one at Fountain, staff member or inmate, will know who has or had COVID-19 until testing, and until then, anyone may contract COVID-19. (*Id.* at 30, PageID.266). ADOC will only test

32

when an inmate is symptomatic or a priority. (*Id.*). Wexford has possession of ample documentation from plaintiff's previous sick call slips prior to May 27, 2020, where there has been a week or longer delay seeing a doctor. (*Id.* at 31, PageID.267).

Plaintiff is not complaining that there is no medical grievance procedure; it is ADOC that has no grievance procedure despite PLRA exhaustion requirements. (*Id.*). And Plaintiff contends that defense counsel knows that PLRA does not obligate a person suffering constitutional violations to use a grievance process that is futile, perfunctory, or does not otherwise exist. (*Id.* at 32, PageID.268). In the absence of forms, he did everything he could verbally and on paper (request slips) to request COVID-19 protection.  (*Id.*).

Plaintiff maintains that he is not contending that he has COVID-19, but he is being continually threatened by staff and free-world persons who enter Fountain that they may have had contact with someone on the outside who had contact with COVID-19, such as someone escorting an inmate to free-world hospital appointment where COVID-19 exists, like D.T.'s situation. (*Id.* at 33, PageID.269). In addition, in the past couple of months, inmates from Kilby, Draper, Bibb, Bullock, Easterling, and Hamilton A & I, etc. have transferred in. (*Id.* at 34, PageID.270). And counsel's representation that no one has tested positive at Fountain is not exactly true because no one has been tested. (*Id.*). Plaintiff also disagrees with Dr. Hood's representation that "as of May 8, 2020, no person living or working at Fountain has been diagnosed with COVID 19"

because no testing is being done so there is no way to know when an inmate may have had it or has it even though transfers are occurring. (*Id.* at 35, PageID.271). He mentions that D.T. or an officer who may have quit were not excluded from this declaration.  (*Id.*).

Plaintiff maintains there is a credible threat of contracting COVID-19 since no one is being tested and since D.T. could have been exposed before he left Fountain by contact with staff or a medical patient from work release. (*Id.* at 38, PageID.274). Plaintiff hopes to preserve the status quo until the danger passes. (*Id.* at 40, PageID.276). Protection should be granted given the novelty of the virus.  (*Id.*).

Dr. Puisis' attached declaration contains additional information on the Alabama's prison system based on his 2016 systemic review of its medical program. (*Id.* at 42, PageID.278). He notes that possibly all of Alabama's prisons lack air conditioning so fans are used which can promote the spread of respiratory infections. (*Id.* at 45, at PageID.281). Additionally, the dorms are not arranged to allow for social distancing. (*Id.*).

In Plaintiff's declaration, he argues that COVID-19 remains an imminent threat/ danger to him, others, and the public at large if a preliminary injunction is not granted. (Doc. 16-1 at 1, PageID.284). ADOC, which includes defendant Governor Ivey, both individually and officially, are not providing adequate testing for COVID-19. (*Id.* at 2, PageID.284). The overcrowded conditions noted by the Department of Justice, which

have not been remedied, are a breeding ground for the spread of COVID-19 statewide, according to Dr. Puisis. (*Id.*). He cannot socially distance himself from others. (*Id.* at 3, PageID.286). Because of what he has witnessed in the past caused by the massive overcrowding, i.e., deaths, no guards or protection, he lives in fear that COVID-19 shall endanger him because of his age and health problems, which he instructs the Court to learn by examining his prior case. (*Id.*). He thinks that Defendants are committing fraud upon the Court. (*Id.* at 4, PageID.287). And a hearing is warranted on the merits or on the preliminary injunction until the crisis passes and he and others are tested. (*Id.*). Moreover, even though ADOC issued masks to inmates to wear voluntarily on April 16, 2020, the inmates were warned that they are not guaranteed to be effective against the spread of COVI-19, but they are now being forced to wear them with sanctions being written only on him and other inmates in the law library. (*Id.* at 7-8, PageID.290-91). He contends that forced wearing of masks, absent testing of him and others, is causing him to have difficulty breathing in the heat due to his age and unidentified underlying health issues. (*Id.* at 8, PageID.291). He asserts that wearing masks outside the dorm on the way to the kitchen is absurd as you will be eating. (*Id.*).

## II.   Analysis.

Because Plaintiff is proceeding *pro se*, the Court gives his allegations a liberal construction by holding them to a more lenient standard than those of an  attorney, *Tannenbaum v. U.S*., 148 F.3d 1262, 1263 (11th Cir. 1998), but "this leniency does not

give a court license to serve as de facto counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action." *Campbell v. Air Jamaica Ltd.*, 760 F.3d 1165, 1168–69 (11th Cir.) (citation and quotation marks omitted), *cert. denied*, 574 U.S. 1047 (2014). Even though Plaintiff is proceeding *pro se*, he "is subject to the relevant law and rules of court including the Federal Rules of Civil Procedure." *Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir.), *cert. denied*, 493 U.S. 863 (1989). The Court treats factual allegations as true, but it does not treat as true conclusory assertions or a recitation of a cause of action's elements. *Ashcroft v. Iqbal.* 556 U.S. 662, 678-81, 129 S.Ct. 1937, 1950-51, 173 L.Ed.2d 868 (2009).

The primary purpose of a preliminary injunction is to maintain the parties' relative positions until the merits are addressed. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). On account of haste associated with such a request, findings of facts and conclusions of law are not binding at trial. *Id.*

"To obtain a preliminary injunction, [a plaintiff is] required to establish that (1) 'a substantial likelihood of success on the merits' exists; (2) [he] would suffer irreparable harm absent an injunction; (3) 'the threatened injury to [him] ... outweighs' any harm the injunction might cause the defendants; and (4) if issued, the injunction would not be adverse to the public interest." *Swain v. Junior,* 958 F.3d 1081, 1088 (11th Cir. 2020) (staying the district court's imposition of a preliminary injunction imposing restrictions to fight COVID-19) (quoting *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th

36

Cir. 2016)). "A preliminary injunction is an 'extraordinary and drastic remedy,' [for which the movant] bears the 'burden of persuasion' to clearly establish all four of these prerequisites." *Wreal, LLC v. Amazon.com, Inc.,* 840 F.3d 1244, 1247 (11th Cir. 2016).

An injunction cannot issue unless there is a showing of an irreparable injury that is a real and immediate threat. *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). It is "the likelihood of substantial and immediate irreparable injury," *O'Shea v. Littleton*, 414 U.S. 488, 502, 94 S.Ct. 669, 679, 38 L.Ed.2d 674 (1974), not its possibility, that must be shown if injunctive relief issues. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 375, 172 L.Ed.2d 249 (2008).

Thus, it is Plaintiff's burden when he requested preliminary injunctive relief to show that he will *likely* suffer an actual injury that is imminent and irreparable in the absence of the injunction's issuance. *Id.*; *Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir. 2000). "[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury." *Winter,* 555 U.S. at 22, 129 S.Ct. at 375 (citation and quotation marks omitted). An injury that is remote or speculative does not demonstrate a substantial likelihood that an irreparable injury will be suffered. *Siegel*, 234 F.3d at 1176. Considering these standards for the injury Plaintiff must demonstrate, Plaintiff has not borne his burden of persuasion on this element.

No showing has been made that COVID-19 was present at Fountain when the complaint or motion for preliminary injunction were filed, nor has a showing been made

that COVID-19 is presently at Fountain. Plaintiff has operated under a belief, which

defendants contradict, that inmate D.T. suffered from COVID-19 while at Fountain and,

because he was exposed to D.T. at Fountain, he was exposed to COVID-19. D.T.'s

movement history shows that D.T. had been at Fountain since October 16, 2019,

continuously according to D.T.'s movement history, until he left there on March 23, 2020

for medical treatment, never to return to Fountain. (Doc. 31-1 at 17, PageID.116). After

leaving Fountain, D.T. was exposed to COVID-19 and tested positive for it, and D.T.

eventually died as a result of his underlying conditions. (Doc. 13-3 at 3-4 ¶5,

PageID.213-214; *see also* Doc. 13-2 at 2 ¶3, PageID.132). Even though Plaintiff

speculated in his reply as to how COVID-19 could enter Fountain, he has not pointed to

a direct source for COVID-19 actually being at Fountain except for mentioning D.T.

Thus, Plaintiff did not identify a source for direct exposure of COVID-19 to him when he

filed his complaint, his subsequent motion for preliminary injunction, and later his reply,

and he admits to not having COVID-19 in his reply. Nor did Plaintiff point to another

inmate who had contact with D.T. and afterwards came down with COVID-19.

Furthermore, Plaintiff admits that he is sixty-three years old, but he has not identified his

underlying health condition(s) that the CDC indicated would place him at a higher risk

for developing a more severe illness from COVID-19.  Thus, the immediacy necessary for

preliminary injunctive relief to issue has not been shown, and it has not been shown that

there is a substantial likelihood that Plaintiff will suffer an actual injury, much less an

injury that is irreparable, if he is exposed to COVID-19.

Moreover, the information produced by Defendants showing their efforts to prevent the entry and spread of COVID-19 at Fountain strengthens the Court's conclusion that an injury is more remote or speculative than it is imminent. As of May 8, 2020, Defendants state that no one at Fountain had tested positive for COVID-19. (Doc. 13-1 at 5 ¶5, PageID.104; Doc. 13-3 at 4¶5, PageID.214). The absence of COVID-19 at Fountain, Defendants maintain, is due to the many measures that have been taken by prison officials, in accordance with CDC Guidance[12] and ADOC Office of Health Services,[13] to prevent the introduction of COVID-19 into the prison, namely, enacting a moratorium on taking in new inmates; ceasing inter-prisons transfers except for urgent medical services and serious security threats, which Plaintiff disputes; eliminating the use of free-world medical facilities except for urgent care; curtailing visitation privileges for inmates; screening the arrival of and absences of staff for COVID-19 and its symptoms; educating staff and inmates on COVID-19 and the prevention of infection from it with oral and written communication and signage, the effectiveness of which Plaintiff disputes; eliminating medical co-pays; providing ample soap at no cost for additional handwashing; providing hand-sanitizers in appropriate locations; providing inmates with two masks with directions explaining how to use, care for, and launder them; providing

[12] Doc. 13-2, PageID.143 Ex.1.

[13] Doc. 13-2, PageID.170 Ex.2.

masks and gloves for staff; increasing the intensity of the cleaning and disinfecting of Fountain and auditing these efforts, which Plaintiff contests; monitoring inmates for symptoms of COVID-19; educating and encouraging the inmates and staff about social distancing; testing inmates for COVID-19 who have symptoms of COVID-19, have become a priority for testing, have been exposed to a person testing positive for COVID-19, or are suspected of having COVID-19; and planning for the quarantining and treating of a person who tests positive for COVID-19, is suspected of having, or has been exposed to COVID-19.

Many of the measures that Fountain is taking in its response to COVID-19 were reviewed by the Eleventh Circuit in *Swain v. Junior,* 958 F.3d 1081 (11th Cir. 2020) (*Swain* I), when the Eleventh Circuit stayed the preliminary injunction entered by the district court. In *Swain* I*,* several inmates at Metro West Detention Center in Miami tested positive in early March for COVID-19, which caused the department that operates the jail to institute preventive measures. Later, when the CDC issued its *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correction and Detention Facilities* on March 23, 2020 (*see* Doc. 13-2, PageID.144, Naglich Decl.), additional safety measures were implemented. A temporary restraining order was entered by the district court, and after a telephonic evidentiary hearing, a preliminary injunction was entered and habeas relief under 28 U.S.C. § 2241 was denied. *Id.* at 1086 & n.1. The district court fashioned most of its order on the CDC's Guidance, and to ensure compliance, it

included reporting requirements.

A motion for stay pending appeal of the preliminary injunction was filed by the defendants Miami-Dade County and the Director of the Miami-Dade Corrections and Rehabilitations Department. The Eleventh Circuit stayed the injunction pending an appeal. *Id.* at 1085.

The legal standard for issuing a stay is somewhat similar to the standard for issuing injunctive relief. *Id.* at 1088.  With regard to the element of a likelihood of success on appeal, the Eleventh Circuit determined that the district court erroneously had collapsed the subjective and objective components of an Eighth Amendment claim when it assessed the element of "a substantial likelihood of success on the merits." *Id.* at 1088-89. When the district court treated an increase in COVID-19 infections as proof of defendants' intentional disregard of an intolerable risk, the Eleventh Circuit concluded that the district court "likely violated the admonition that resultant harm does not establish a liable state of mind." *Id.* The fact that meaningful social distancing was not able to be achieved, and in fact was impossible under current conditions, was held not to demonstrate a reckless state of mind as the district court had found. *Id.* Rather, the Eleventh Circuit found that being unable to take positive action did not constitute "a state of mind more blameworthy than negligence." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 835, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994)).

Therefore, the Eleventh Circuit reasoned that defendants were likely to succeed

41

on appeal because the evidence did not suggest deliberate indifference, but instead reflected that they were taking the COVID-19 seriously, as shown in their attempts to protect staff and inmates during the pandemic and doing their best to balance social distancing and implementing that facility's regulations. *Id.* Because "defendants adopted extensive safety measures such as increasing screening, providing protective equipment, adopting social distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures," and a court-retained expert's report commended the staff and inmates for doing their best, the Eleventh Circuit concluded that defendants' actions tended not to indicate deliberate indifference and that the district court appeared to have erred on this element. *Id.* at 1090.

With respect to the element that defendants would be irreparably harmed without the stay, defendants' position was they lost their discretion as to how they allocate scarce resources to fight COVID-19 among different county operations. *Id.* In finding that the defendants showed that they were irreparably harmed, the Eleventh Circuit deduced that the injunction effectively made the district court a "super warden" in an area where the Supreme Court advised, "it is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Id.* (citation and quotation marks omitted). The Eleventh Circuit found that "[t]he injunction hamstrings MDCR officials with years of experience running correctional facilities . . .

from acting with dispatch to respond to this unprecedented pandemic. . . [and] to the rapidly evolving circumstances. . . without first seeking a permission slip from the district court." *Id.* (citation and quotation marks omitted). Thus, the Court found defendants were being irreparably harmed by the injunction. *Id.*

With regard to the remaining two grounds - the balance of harms and the public interest, the Eleventh Circuit held the grounds merged and found that the question presented was whether plaintiffs had shown they would suffer irreparable injuries that they would not otherwise suffer without an injunction. *Id.* at 1091. Because there was no showing that defendants had abandoned the safety measures, or would do so, the balance of harms was found by the Eleventh Circuit to be in defendants' favor. *Id.*

Before concluding its opinion, the Eleventh Circuit addressed a couple of points that were not addressed by the district court in its analysis of the element of the likelihood of success on the merits. *Id.* By not addressing *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Eleventh Circuit found that the district court's entering a preliminary injunction against an officer in his official capacity without determining that *Monell* was satisfied was error. *Id.* And because defendants raised lack of exhaustion, the district court was required to address it at the outset of the case. *Id.* That is, the district court would not be able to determine if plaintiffs were likely to succeed on their claim without concluding that defendants

would be unlikely to meet their burden of showing a lack of exhaustion. *Id.*[14][15]

[14] In the present action, Defendants raise that Plaintiff failed to exhaust his administrative remedies available to him for his health care services. (Doc. 13 at 24, PageID.93). Defendants assert that "[a]n inmate may grieve (among other things) the inadequacy of medical care, the failure to provide medical supplies, and the failure to properly test, manage, or treat an inmate for or with a medical condition." (*Id.* at 24-25, PageID.93-94). Because Plaintiff did not file a grievance, Defendants, then in all-encompassing manner, assert that he cannot succeed on his claims against the State and his Emergency Notice should be denied. (*Id.* at 25, PageID.94).

In Plaintiff's reply, he asserts that ADOC does not maintain a grievance procedure, except for a grievance procedure provided by Wexford for medical claims. (Doc. 16 at 3, 32, PageID.239, 268; *see* Doc. 13-3 at 11, Wexford's grievance mechanism for health complaints). And the undersigned notes that in *Swain* I, the conditions-of-confinement claims were analyzed by the Eleventh Circuit pursuant to *Farmer v. Brennan, supra,* a conditions-of-confinement case, not *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). *See Swain,* 958 F.3d at 1088-89.

[15] Since drafting the Report and Recommendation, the Eleventh Circuit addressed the merits of the injunction entered by the district court in *Swain v. Junior,*___F.3d___, 2020 WL 3167628 (11th Cir. June 15, 2020) (*Swain* II), and "conclude[d] that the district court erred in issuing the injunction." *Id.* at *1. Thus, the injunction was vacated, and the case remanded to the district court. *Id.* The Eleventh Circuit's reasons mirrored some of those issued by the other appellate panel in *Swain* I, *supra*, granting the stay of the preliminary injunction.

To be brief, in *Swain* II, the Eleventh Circuit addressed the injunctive relief element that was the district court's focus - "the likelihood that the plaintiffs will succeed on the merits of their constitutional claim." *Id.* at *4-*5. Because the plaintiffs were a group of medically vulnerable pretrial detainees, their claims arose under the Fourteenth Amendment, which for conditions-of-confinement claims have the same standard as an Eighth Amendment claim. *Id.* at *1, *5. An Eighth Amendment violation occurs when a jailer or prison official "is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury." *Id.* at *5.

The Eleventh Circuit in *Swain* II noted that when the complaint was filed, there were no COVID-19 cases at Miami's Metro West Detention Center, but within three weeks, 163 inmates had tested positive for COVID-19. *Id.* at *4. Consequently, the defendants did not dispute that COVID-19 presents a substantial risk of serious harm; thus, the objective element of an Eighth Amendment violation was met. *Id.* at *5. And, with respect to the subjective element, defendants did not dispute that they had subjective knowledge of the virus's risk. *Id.* Therefore, the question became "whether the defendants 'disregard[ed]' the risk 'by conduct that [was] more than mere negligence[.]'" *Id.* (quoting *Farmer,* 511 U.S. at 836). The Eleventh Circuit stated, "Even where 'prison officials ... actually knew of a substantial risk to inmate health or safety,' they may nonetheless 'be found free from liability if they responded reasonably to the risk'—and,

importantly for present purposes, 'even if the harm ultimately was not averted.'" *Id.* (quoting *Farmer,* 511 U.S. at 844). The Eleventh Circuit noted this standard "incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Id.* (quoting Farmer, 511 U.S. at 844-45).

The Eleventh Circuit observed the district court concluded that plaintiffs were likely to succeed on their claim for an Eighth Amendment violation and that all four factors for injunctive relief were met. *Id.* at *6. This conclusion, the Eleventh Circuit determined, involved the district court finding that the defendants were deliberately indifferent even though the defendants had taken numerous measures to combat COVID-19. *Id.* As perceived by the Eleventh Circuit, the basis for the district court's conclusion rested on its deduction that infections increased at Metro West and "the lack – and seemingly impossibility – of meaningful social distancing at the facility." *Id.* The district court, however, was found to have erred by the Eleventh Circuit in reaching this conclusion. *Id.* "Neither the resultant harm of increasing infections nor the impossibility of achieving six-foot social distancing in a jail environment establishes that the defendants acted with 'subjective recklessness as used in the criminal law[,]" which is required for showing a sufficiently culpable state of mind for deliberate indifference. *Id.* at* 5, *6 (quoting *Farmer,* 511 U.S. at 839–40). Moreover, the Eleventh Circuit emphasized "the Supreme Court's decision in *Farmer* couldn't be any clearer: '[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted.'" Id.* at *7 (quoting *Farmer,* 511 U.S. at 844) (emphasis in original).

The measures defendants did take were reviewed by the Eleventh Circuit as was the CDC's Guidance document. *Id.* at *8. The CDC Guidance was noted by the Eleventh Circuit for "presuppos[ing] that some modification of its social-distancing recommendations will be necessary in institutional settings" and for providing on its first page, in bold, that it "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." *Id.* (quoting CDC Guidance at 1). The CDC Guidance was acknowledged by the Eleventh Circuit for advising that six feet between inmates is the ideal, but distance will need to be tailored to the facility's space and the needs of the inmate population and staff. *Id.*

In its opinion, the Eleventh Circuit addressed several other issues as well as the remaining elements for issuing injunctive relief. Pertinent to the present recommendation is the element - irreparable harm will be suffered in the absence of injunctive relief issuing. The Eleventh Circuit "agree[ed] with the defendants that the inquiry isn't whether the plaintiffs have shown that the virus poses a danger to the inmates in the abstract—it undoubtedly does—but rather whether they have shown that they will suffer irreparable injury 'unless the injunction issues.'" *Id.* at 11. The Eleventh Circuit concluded that in granting the injunction, the district court "gave no consideration to whether the plaintiffs were likely to suffer irreparable injury absent an injunction" because it did not make factual findings about the extent of defendants' measures

Furthermore, in another decision, *Valentine v. Collier,* 956 F.3d 797 (5th Cir. 2020),

*denying mot. to vacate stay,* 140 S.Ct. 1598 (U.S. May 14, 2020), the Fifth Circuit granted

the stay of the preliminary injunction entered by the district court. *Id.* at 806. Inmates

from the Pack Unit, which housed elderly high-risk and disabled inmates, sued their

warden and the executive director of the Texas Department of Criminal Justice to

mitigate the spread of COVID-19.[16] The district court entered a preliminary injunction

from which defendants sought a stay. When considering the elements for entering a

stay, the Fifth Circuit began with the element of the defendants' likelihood of success on

appeal. *Id.* at 801. It, too, found that the district court collapsed the objective and

subjective components of an Eighth Amendment inquiry. *Id.* at 802-03. The  appellate

and their efficacy. *Id.* The Eleventh Circuit then emphasized that the issuance of a preliminary injunction should only occur upon a clear showing that a plaintiff is entitled to the extraordinary relief. *Id.* And it reiterated its past holdings, that the "irreparable injury must be neither remote nor speculative, but actual and imminent." *Id.* (quoting *Seigel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).

With regard to the recent *Swain* II decision, the undersigned notes in passing that the injunctive relief element – the plaintiff will likely succeed on the merits of his constitutional claim – similarly, and more than likely, has not been met by Plaintiff Charest in this action. Defendants have taken many measures to combat the introduction and spread of COVID-19 at Fountain, thereby indicating the lack of deliberate indifference necessary to establish an Eighth Amendment violation on their part. The undersigned did not specifically address this element because Plaintiff failed to meet the irreparable-injury element, which is noted in *Swain* II as "the *sine qua non* of injunctive relief," that is, "without which not," in other words, it is the essential element. *Id.* at *11; *see* www.merriam-webster.com (last visited June 19, 2020).

[16] An inmate in the Pack Unit had died from viral pneumonia cause by COVID-19. *Valentine v. Collier,*___F. Supp.3d___, 2020 WL 1916883, at *5 ¶8, *10 (S.D. Tex. Apr. 20, 2020).

court reasoned "[t]he incidence of diseases or infections, standing alone, do not imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks." *Id.* at 801 (citation and quotation marks omitted). Rather, a denial of "basic human needs" must be shown. *Id.* And they must show that the defendants' state of mind was deliberate indifference. *Id.* at 802. No evidence indicated that defendants subjectively believed their measures were inadequate; rather, the court found that defendants have taken and continue to take measures to stop and control the spread of COVID-19. *Id.*

Thus, at this time, with the evidence before this Court, that being Plaintiff's complaint and declarations and Defendants' response, and in light of the *Swain* decisions, the undersigned concludes that Plaintiff failed to carry his burden of persuasion on the element that a substantial likelihood exists that he will suffer irreparable injury should a preliminary injunction not issue. Moreover, from a review of the CDC Guidelines (attached to Defendants' response), which recognizes the necessity of a facility's need for adaptation, the prison officials are complying with the guidelines for correctional and detention facilities as best they are able under complicated circumstances. (Doc. 13-2 at 14-39, PageID.144-170). Based on the information before the Court, Defendants' efforts at this time appear to have protected the inmates at Fountain.

**III. Conclusion.**

Because Plaintiff did not carry his burden of persuasion on the element that he would suffer imminent irreparable injury if a preliminary injunction did not issue, he failed to carry his burden of persuasion on all four elements necessary for injunctive relief to issue and, therefore, it is recommended Plaintiff's motion for a preliminary injunction be denied. *See Wreal, LLC,* 840 F.3d at 1247 (the burden of persuasion on all four elements must be met before injunctive relief can issue).

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D. Ala. Gen.LR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is

made, state the basis for the objection, and specify the place in the Magistrate Judge's

report and recommendation where the disputed determination is found. An objection

that merely incorporates by reference or refers to the briefing before the Magistrate

Judge is not specific.

**DONE** and **ORDERED** this 6th day of July, 2020.


/s/ KATHERINE P. NELSON
**UNITED STATES MAGISTRATE JUDGE**