IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION


PATRICK J. CHAREST,          :
    Plaintiff,               :
                             :
vs.                          :          CIVIL ACTION 20-0214-TFM-N
                             :
GOVERNOR KAY IVEY and        :
WARDEN MARY COOK,            :
    Defendants.              :


### **Report and Recommendation**

Plaintiff, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983.[1] This action has been referred to the undersigned for appropriate action pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R). Presently, before the Court is Defendants' motion for summary judgment.[2] (Doc. 35). For the reasons set forth below, Defendants' motion for summary judgment is **GRANTED**, and Plaintiff's action is **DISMISSED** in its entirety.

---

[1]    Plaintiff's complaint was previous reviewed by this court as satisfying the exception to 28 U.S.C. § 1915(g), that he was under imminent danger of serious physical injury at the time of filing, and Charest was allowed to proceed *in forma pauperis*. (Doc. 9).

[2]    On May 4, 2020, this Court entered an order denying Plaintiff's Motion for a Temporary Restraining Order and after expediting briefing, referred Plaintiff's Motion for a Preliminary Injunction to the undersigned. (Docs. 5, 14). On July 6, 2020, the undersigned entered a report and recommendation which recommended denial of the motion for preliminary injunction. (*See* Doc. 19). Plaintiff filed a document entitled Emergency Motion for De Novo Review and Issuance of P.I. (Doc. 20), which the court construed as an objection to the report and recommendation. On August 28, 2020, after conducting a de novo review of the case file, Plaintiff's objections were overruled and the Report and Recommendation denying a preliminary injunction was adopted as the opinion of the Court. (Docs. 19, 21).

## I.    Complaint.

Plaintiff Patrick Charest is currently in custody of the Alabama Department of Corrections ("ADOC") and incarcerated at G.K. Fountain Correctional Facility ("Fountain"), in H-Dormitory.   Plaintiff is suing Alabama Governor, Kay Ivey, and Fountain's Warden, Mary Cooks, for their failure to protect him and other inmates by not providing preventative supplies, services and testing for COVID-19, for their deliberate indifference to imminent physical danger/death of COVID-19, and claims that 28 U.S.C. § 2244 violates the First and Fourteenth Amendments of U.S. Constitution.  (Doc. 1 at 11).

In his complaint, filed April 7, 2020, Charest broadly alleges he is a "sitting duck" waiting to contract COVID-19 because Fountain has active COVID-19 cases and no testing or means for Plaintiff to request testing.  (*Id*. at 8).  He alleges the "ADOC defendants" are acting with deliberate indifference in refusing to test and remove inmates who have shown symptoms of COVID-19, i.e., sick, coughing, feverish.  (*Id*.).   Furthermore, "ADOC defendants" are lying to families and the public that they are bleaching and cleaning the prison and providing COVID-19 sanitation supplies, sprays, ample soap, disinfectant, masks, and shields.  (*Id*.). Charest claims that based on his age of 63-years-old and his "infirmities", he and other inmates are in imminent danger of serious physical injury – namely death.  (*Id*. at 5-6).  Specifically, Charest alleges:

- His dorm (which houses 75 to 125 inmates) has no cleaning supplies to kill COVID-19, despite his request for such on April 7, 2020.  (*Id*. at 5)
- There is no cleaning done to the kitchen tables, floors, and utensils that are left unattended and no hand-sanitizer distributed during the three meals he eats with 75 to 100 other inmates. (*Id*.).
- Six-foot social distancing is not enforced by "ADOC defendants" and inmates congregate during meals, recreation, and in their housing.  (*Id*.).
- "ADOC defendants" do not test inmates who have flu-like symptoms, such as a running nose, running eyes, cramps, and fever, and inmates around him are coughing, sneezing, and smoking.  (*Id*.).

- Transfers of inmates among prisons are still permitted, as well as allowing free-world people and other officers to enter Fountain without wearing protective gear (gloves, masks). (*Id*. at 6).
- "ADOC defendants" "suggest" inmates "practice social distancing, preventiveness, but refuse [to] supply [him and] (others) with CDC recommended supplies (adequate soap, disinfect[ant] spray, [and] bleaching materials[] to clean [his] living area, or tables, benches in TV area or chow hall–during – after feeding (3 x a day)!!!" (*Id*. at 6).

Plaintiff also alleges that between March 18, 2020 and March 23, 2020, when the CDC (Centers for Disease Control and Prevention) made announcements, he requested from Defendant Cooks and other officers a bleach disinfectant for the small (12 x 20 foot) law library. (*Id*. at 4). After a few days, Captain Knight brought a small bottle of Lysol wipes, and a few days later, she told Plaintiff to stop writing and asking for anything else. (*Id*.). Subsequently, on April 7, 2020, Plaintiff wrote a letter thanking them and asking for the "same protection" in his dorm, H-Block, but none came. (*Id*. at 5). He also requested hand-sanitizers be distributed during the three meals he eats with 75 to 100 other inmates. (*Id*.). Furthermore, inmate McConico requested a typewriter from Captain Knight, and Captain Knight "screamed" for him to get six feet away from her. (*Id*. at 4).

Charest further challenges the constitutionality of 28 U.S.C. § 2244 because he contends that it violates his First and Fourteenth Amendment rights, i.e., this statute denies access to courts, is cruel and unusual punishment, and is a deprivation of his due process and equal protection rights. (*Id*. at 8-9). Section 2244 prevents him from re-filing a second habeas petition unless there is a new rule of law or he is actually innocent. (*Id*. at 9). Plaintiff was not sentenced to death, but in light of COVID-19 and his prior medical condition and age, "ADOC defendants" are being deliberately indifferent in their efforts to protect him from it. (*Id*.). He claims when Congress enacted §2244, it failed to provide a remedy for relief from unconstitutional detention that is the result of a medical emergency

or a public danger such as COVID-19. (*Id.*). Thus, this section deprives him of his constitutional rights arbitrarily. (*Id.* at 10).

Charest seeks a declaratory judgment and preliminary injunctive relief (previously denied) for the alleged violations of his constitutional rights.[3] (*Id.* at 13).

## II.     Motion for Summary Judgment.

Defendants Governor Ivey and Warden Cooks have Answered the Plaintiff's suit denying the allegations asserted against them and filed a Special Report in support of their denial. (Doc. 25). Defendants argue in their joint Special Report that Plaintiff has failed to make a case for deliberate indifference with respect to the Alabama Department of Corrections' response to the COVID-19 pandemic at Fountain.[4] (Doc. 25). Namely, Defendants claim that Plaintiff has failed to allege how COVID-19 presents a substantial risk of serious harm to Charest, personally, nor that Defendants knew of such serious risk and disregarded the risk with a sufficiently culpable state of mind. (*Id.* at 3-4). Moreover, Defendants assert that they have recognized the danger created by COVID-19 and have

---

[3]     In his complaint, Plaintiff states that he requests the court "Issue a Declaratory Judgment – Preliminary Injunction, Emergency Covid-19 Testing, Prevention of Services, Supplies for Living Areas, Kitchen, et. cetera. (Doc. 1 at 13).

After briefing by the parties, the court denied Charest's motion for a temporary restraining order and/or preliminary injunction, finding, *inter alia,* Plaintiff had not shown that COVID-19 was present at Fountain at the time his motion was filed, thus failing to carry his burden of persuasion on the element that he would suffer imminent and irreparable injury. (Docs. 17, 19, 21).

[4]     Defendants further assert that Plaintiff is barred from any claim for money damages pursuant to the PLRA, as well as being barred by the Eleventh Amendment for claims of money damages in their official capacities, that all individual claims for money damages are barred by qualified immunity, and that the Plaintiff lacks standing to pursue injunctive relief. (Doc. 25 at 10-13). These issues will be addressed more thoroughly at Section, V., B., 2.

reasonably responded to the risks, taking "numerous steps to protect inmates and staff from

exposure to COVID-19", including:

> a.      Educating inmates and staff through oral and written communication, including signage, about symptoms of COVID-19, proper hygiene practices, and social distancing;
>
> b.      Encouraging inmates and staff to engage in proper hygiene practices and social distancing;
>
> c.      Providing and restocking antibacterial soap in bathrooms and housing areas and hand sanitizer in main hallways and dining areas to allow frequent hand-washing, [but not in housing units and recreational areas due to the potential for misuse in creating drinking alcohol];
>
> d.      Continuing medical appointments such as chronic care clinics and sick-call appointments;
>
> e.      Suspending copays for inmates seeking medical services;
>
> f.      Implementing intensified cleaning and disinfecting procedures;
>
> g.      Suspending the intake of new inmates and, when restarted, ensuring an appropriate quarantine and screening before transferring the new intakes from a temporary intake facility to a permanent intake facility;
>
> h.      Performing verbal screening and temperature checks for all person entering the facility and, if a person has a temperature over 100.4 degrees Fahrenheit or other symptoms of COVID-19, denying the person entry into the facility;
>
> i.      Implementing social distancing strategies;
>
> j.      Providing two (4) masks to each inmate, along with instructions on wearing, cleaning, and caring for the masks;
>
> k.      Providing masks and gloves to administrative and correctional staff, along with instructions on wearing, cleaning, and caring for the masks;
>
> l.      Providing personal protective equipment, including masks and gloves, to medical and mental-health staff, along with instruction on wearing, cleaning, and caring for the masks;
>
> m.     Implementing a quarantine or medical isolation plan for any inmate or staff who tests positive for COVID-19 or is suspected or having or being exposed to COVID-19;
>
> n.      Monitoring inmates for symptoms of COVID-19 such as cough and shortness of breath or at least two (2) of fever, chills, repeated shaking with chills, muscle pain, headache, sore throat, and new loss of taste or smell; and
>
> o.      Testing and isolating inmates with symptoms of COVID-19 or contact with a person testing positive for or suspected of having COVID-19.

(*Id.* at 5-7).[5]  Defendants further rely on their record responses, primarily Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, which includes declarations under penalty of perjury of Defendant Mary Cooks, Associate Commissioner for Health Services for the ADOC Ruth Naglich, and Dr. Hugh Hood, in support of their denial of the allegations against them.

Defendants maintain (through the sworn declaration of Ruth Naglich, Associate Commissioner for Health Services) that the ADOC began planning early in March 2020 for COVID-19.[6]  (Doc. 13-2 at 3).  At the facility level, ADOC and Wexford Health Sources, Inc. ("Wexford") (which is contracted to provide medical services to inmates in the custody of the ADOC) created Pandemic Planning Teams that included Warden Cooks, Health Service Administrator, Office of Health Services ("OHS") Regional Associate Director of Health Services, Medical Director of the facility, and others such as the Facility Food Service Manager and Facility Maintenance. (*Id.* at 4-5). Its planning entailed assessing the levels of correctional and medical staff needed; determining locations for quarantining inmates; evaluating supplies of personal protection equipment, soap, paper

---

[5]    In opposing the motion for preliminary injunction, Defendants submitted a virtually identical list of strategies and steps taken to protect inmates and staff from the COVID-19 virus.  (*See* Doc. 13 at 9-10).  The original list articulated three steps which have been removed from the current list:

g.    Auditing the cleaning and disinfecting of the facility; . .

h.    Suspending the intake of new inmates and, when restarted, ensuring an appropriate quarantine and screening before transferring the new intakes from a temporary intake facility to a permanent intake facility, as noted above; . . .

n.    Suspending interfacility transfers of inmates within the ADOC system, except for essential medical services or serious security threats. . .

(Doc. 13 at 9-10).

[6]    Ruth Naglich, as Associate Commissioner for Health Services, participates in and oversees "the preparation, prevention, and management efforts associated with COVID-19 within the ADOC. System."  (Doc. 13-2 at 1, 9).

towels, disinfectants, and food; and educating staff and inmates about the signs and symptoms of COVID-19. (*Id.*).  On March 23, 2020, the CDC issued "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-2019) in Correctional and Detention Centers" (CDC Guidance) that contained guiding principles for prisons.  (*See Id.* at 5, 14-39 (copy of CDC guidance for prisons)).  ADOC utilized said guidance and provided education about COVID-19 to persons living and working in the ADOC's facilities, and ADOC posted in its facilities, including Fountain, documents from OHS and CDC explaining signs and symptoms of COVID-19, what to do if you have them, proper hygiene and other preventive practices, and how to address stress associated with COVID-19. (*Id.* at 5, 40-49 (copies of educational communications)).

Acting on CDC's Guidance, and after consulting with the Alabama State Health Officer, ADOC quit receiving new intakes and closed it facilities to all outside visitors to avoid the introduction and spread of COVID-19 into the ADOC system. (*Id.* at 5-6). On March 20, 2020, ADOC Commissioner Dunn announced a 30-day moratorium on taking in new inmates to ADOC's system, with one exception for state inmates with severe medical conditions, who would be approved on a case-by-case basis by OHS. (*Id.* at 6).

With regard to staff, ADOC began screening staff upon arrival for work or when they called in sick. (*Id.* at 6).  Employees who reported for work had a temperature check and questionnaire to which to respond. (*Id.*).  And, for sick employees, ADOC began a tracking log and a questionnaire to determine when an employee may return to work. (*Id.* at 49 (screening questions and log)).

Cleaning instructions were provided by ADOC, which included a checklist for the kitchen. (*Id.* at 6, 54 (checklist)). And the facilities are also reviewed by ADOC for compliance. (*Id.* at 6).

Defendants affirm facemasks were offered to inmates and persons working at the facilities, and written directions for their proper use, storage, removal and cleaning were provided. (*Id.*). Written acknowledgements or rejections for the facemasks were obtained. (*Id.* at 6-7). Plaintiff accepted a mask, as reflected by his signed acknowledgement. (Doc. 13-1 at 31).

During the thirty-day moratorium on new intakes, a new intake process was developed and implemented on April 21, 2020, for all inmates, except maximum security inmates, with intake for male inmates being at Draper Correctional Facility and intake for females being at a satellite facility near Julia Tutwiler Prison for Women (Tutwiler). (*Id.* at 7). This pilot program was developed to protect the existing inmate population and to be consistent with CDC Guidance; the new intakes are quarantined for fourteen days before they are transferred to Kilby Correctional Facility or Tutwiler to complete the intake process, assuming an inmate has no signs or symptoms of COVID-19 or tests positive for it. (*Id.* at 7). At the conclusion of pilot program, ADOC will evaluate continuing, changing, or terminating it. (*Id.* at 8). Depending on the conclusion, the possibility exists for the reinstitution of the moratorium on intakes from county jails. (*Id.*).

Naglich, as Associate Commissioner for Health Services, affirms ADOC inmates will continue to receive appropriate medical care with respect to prevention and management of COVID-19.[7] (*Id.* at 8). Specifically, she affirms she, ADOC, and Wexford

---

[7]     At the time Defendants filed their Response in Opposition to Plaintiff's Motion for

"continue to evaluate the COVID-19 prevention and management measures [and they] will implement new or different prevention and management measures if and when necessary and consistent with CDC and other guidance." (Doc. 13-2 at 10; *see also Id.* at 14).

Defendant Cooks declares that she put the Pandemic Planning Team's plans into action, implementing extensive prevention and management efforts to combat COVID-19. (Doc. 13-1). She further describes how institutional cleaning for COVID-19 at Fountain occurs:

> A team consisting of a Captain and two (2) to three (3) inmates clean and disinfect surfaces and objects that are frequently touched, especially in common areas, such as plumbing fixtures (i.e., toilets, sinks, etc.), countertops, bed frames (if requested by an inmate), telephones, recreational equipment, and the like. Cleaning teams are deployed every two (2) to three (3) hours between 7 a.m. and 12 a.m. each day. Similarly, inmate bedding and clothing [are] routinely laundered, kitchen appliances, utensils, and cookware [are] routinely washed between meals, and the facility is routinely cleaned. A nutritionist at Fountain audits the cleaning and disinfecting practices at Fountain to ensure they are timely completed and, if a team[ ] fails to timely complete and report a cleaning and disinfection obligation, the nutritionist informs [her] and other supervisory staff and we ensure the sanitation process is completed immediately. Additionally, the completion of a cleaning and disinfecting session is reported to ADOC's Central Office for supplemental oversight.

(Doc. 13-1 at 5-6).[8] Defendant Cooks further avers that in each housing unit are located, almost all day and night, one or two staff members who are trained in COVID-19 symptoms,

---

Preliminary Injunction (Doc. 13), the incidents of COVID-19 in the ADOC system were few. Specifically, as of May 8, 2020, two inmates who tested positive for COVID-19 did so after frequent or lengthy hospital visits and were quarantined, and five inmates who previously tested positive for COVID-19 recovered, but none of these inmates who tested positive were at Fountain. (*Id.* at 8; Doc. 13-1 at 3). ADOC placed strict limits on inmate movement in and out of the system because when a COVID-19 inmate is medically quarantined, additional bed space is lost to protect other inmates from exposure. (Doc. 13-2 at 8-9).

[8]     Subsequent to the submission of Defendant Cooks' declaration and prior to the filing of Defendants' Special Report, "audits" of the cleaning and disinfecting practices at Fountain have discontinued. *See supra*, at n.4.

who report their concerns of an inmate displaying symptoms, and who are available to address any concerns an inmate may have. (Doc. 13-1 at 6).  She is unaware of Plaintiff expressing any concerns about COVID-19 to a correctional officer. (*Id.*).  She denies that she "failed or refused to protect Plaintiff or any other Fountain inmate from COVID-19, to provide preventative supplies such as antibacterial soap or hand sanitizer (at the appropriate locations), or to take reasonable steps to prevent and manage COVID-19 in Fountain." (*Id.* at 7).  However, healthcare decisions concerning screening, testing, diagnosing, managing, and treating inmates at Fountain are made by Wexford, ADOC's health-care vendor. (*Id.*).

As to the alleged risk COVID-19 poses to Charest, individually, Defendants submit the sworn testimony of Dr. Hugh Hood, who serves as the Associate Regional Medical Director/Physician Director for Wexford.  (*See* Doc. 13-3).  After evaluating the medical records of Charest, Dr. Hood advises:

> Plaintiff is not a person at high risk for sever illness from COVID-19.  The Centers for Disease Control and Prevention, an operating division of the U.S. Department of Health & Human Services ("CDC"), has identified persons at higher risk of severe illness from COVID-19 based on currently available information and clinical expertise; persons at high-risk for severe illness from COVID-19 include persons over sixty-five (65) years of age or with serious underlying medical conditions such as chronic lung disease, serious heart conditions, immunocompromised, severe obesity, diabetes, chronic kidney disease undergoing dialysis, and liver disease.  *See* CDC, *People Who Are At Higher Risk*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 6, 2020).  Plaintiff is not sixty-five (65) years or older, and he does not have a CDC-recognized serious underlying medical condition potentially creating a higher risk for severe illness from COVID-19.  Plaintiff therefore is not a person at high risk for severe illness from COVID-19.

(Doc. 13-3 at 4-5).  Dr. Hood affirms that the medical records confirm that Charest has not submitted a sick call request related to COVID-19 nor grieved the denial of any medical services related to COVID-19.[9]  (*Id*. at 7).

As to Charest's allegation that he has not been tested for COVID-19, Dr. Hood declared, "Plaintiff is not a person with symptoms of COVID-19 [and], [f]rom a clinical perspective, ... is not at risk of contracting COVID-19 or any problems associated with COVID-19."[10] (Doc. 13-3 at 9). Thus, "Plaintiff is neither a high priority nor a priority for COVID-19 testing under CDC guidance." (*Id*.).  However, if Plaintiff or another Fountain inmate becomes symptomatic or a testing priority, that inmate will receive testing and, if a positive test results, will be medically isolated and have his healthcare appropriately managed. (*Id*.).  "That is, and has been, the practice at Fountain and other ADOC facilities." (*Id*.).

Defendants provide, "ADOC Officials continue their efforts to protect inmates from exposure to COVID-19, including educating inmates and staff on hygiene and social distancing, providing necessary cleaning supplies and facemasks, establishing an audited cleaning schedule, modifying transfers and intakes, implementing quarantine and isolation plans, and implementing testing procedures. They also will work with the State's Public

---

[9]    This is further supported by the sworn declaration of Naglich, that Charest has not turned in a sick-call request connected to COVID-19, nor has he filed a grievance for the denial of COVID-19 related medical services.  (Doc. 13-2 at 11).  She adds that sick-call requests are triaged and are timely addressed depending on their nature.  (*Id*. at 9).

[10]    Despite Charest's allegations of preexisting and chronic conditions, the record reflects that Charest has refused both a pneumonia and influenza vaccine in the past year and during the evaluated months of March and April 2020, (the two months prior to Defendants' filing their Response in Opposition to Plaintiff's Motion for Preliminary Injunction) Charest failed to show-up for three scheduled chronic care provider clinic appointments.  (Doc. 13-2 at 11).

Health Department to consider vaccinations of inmates and staff." (Doc. 25 at 8-9). Defendants claim they "have gone above and beyond the call of duty to make sure the risk of transmitting COVID-19 is minimized among the inmate population." (*Id*. at 9).

After review of the Defendants' Answer and Special Report (Doc. 25), including the materials incorporated by reference (Doc. 13), the Court converted Defendants' pleadings into a Motion for Summary Judgment under *Federal Rule of Civil Procedure* 56.[11]

### III.   Response in Opposition of Motion for Summary Judgment

In response to Defendants' Motion for Summary Judgment, Charest has submitted multiple pleadings and adopts by reference every previously plead "fact", "exhibit", and "submission" put forth in this action.[12] (Doc. 37 at 1).  Generally, Charest claims that Defendants' factual assertions are "untruthful" and disputes that Defendants are following the CDC guidelines and/or implementing the preventative procedures laid out in their Motion for Summary Judgment, placing his life in danger.[13] (Doc. 37).

---

[11]     Prior to the entry of the Court's conversion order, Plaintiff submitted a "Rule 56(d) Motion" (Doc. 27) and a brief in "opposition/objection to" the Special Report (Doc. 30). These materials will be considered in deciding the present motion for summary judgment, included herein, *infra,* at section III.

[12]     (*See* Docs. 4, 12, 15, 16, 20, 26, 27, 30, 33, 36, 37).

[13]     Specifically, Plaintiff claims, "Charest's LIFE remains in constant danger, as a result of the agency, State's deliberate indifferences, to otherwise provide Covid19 guideline 'protections', with exception to passing out a few cloth masks!" (Doc. 36 at 2). He asserts that "Charest as well as the other 800-1000 inmates at Fountain, have an absolute right being provided – protection that the CDC recommended this Nation employ due this incubus currently killing hundreds of millions of human being(s) Globally, whom like Charest, didn't think they'd be in contact of, or be at risk of contracting Covid19 (quarantined staging camp) for the Southern region's state institutionalized prisoners, from surrounding area's of public concern." (Doc. 37 at 3).

In his response, Charest repeatedly requests discovery, insisting he cannot "meet the burden that has been shifted upon him, without more legal discovery" (Doc. 27-1 at 5). However, Charest fails to identify what documents he seeks nor does he pose

In particular, Charest contends the printed educational materials used by Defendants to communicate COVID-19 symptoms and prevention are ineffective because half of the inmate population is illiterate. (Doc. 37 at 9). He argues his received mask does not provide enough protection and that (due to his age and the heat in the dorms) he has difficulty breathing with the mask on. (Doc. 37-1 at 7-8). He demands hand sanitizer for protection, arguing that the officers are allowed to carry personal hand sanitizer, but the inmates have none (Doc. 37 at 7); furthermore, the three hand sanitizing (foot pump) devices that were placed at the shift office, outside the kitchen area, and near the front entrance of the prison during the summer of 2020 are "bone dry" and have not been replenished with liquid hand sanitizer. (Doc. 37-1 at 4). He asserts he has not observed any "pandemic crews" spraying, cleaning of beds, tables, benches, and living areas since December 2020, because an inmate on the crew has been in disciplinary segregation. (Doc. 27-1 at 3). Charest further expounds that he has not been provided "bleach, spray . . . to wipe his living area down where others sit on, while Charest is at work, or the bathrooms where two-hundred men share with one another" and contends that in the kitchen, "no-one wipes, cleans between meals, before the next set of hundreds enter for their assigned meal." (Doc. 30 at 5). He claims that the CERT teams enter Fountain daily to provide additional security but bypass the COVID-19 screening process at the front gate. (*Id*. at 3). Charest states specifically, that since January 2021, his dorm has failed to receive "handwashing

---

interrogatories to be answered. Notably, at this stage of the suit, Charest's affirmations, even self-serving, are taken as true. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (citations omitted) ("To be sure, [plaintiff's] sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage.... 'Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.' "). Thus, Charest is not hindered by the lack of discovery.

disinfect, soap, liquids, nor ample amounts of cleaning supplies and aerosol for our assigned living area" (Doc. 37-1 at 2, 4) but notes that Dorms K, E, and F (dorms for elderly, assigned workers, and honor dorms) do receive said supplies. (*Id*. at 4-5). Charest then alleges that bleach is being given for cleaning restrooms and shower areas but not the bed area or general/common areas of his dorm. (Doc. 37-1 at 2, 4; Doc. 37 at 7).

As to social distancing protocols, Charest repeatedly maintains that CDC guidelines are not being followed, evidencing deliberate indifference to his health and safety. He contends that the bunk beds in the dormitories are approximately two feet apart (Doc. 12 at 2), forcing him (and other inmates) to sleep within less than 3-4 feet from each other. (Doc. 37-1 at 3). To combat this, inmates have put up stringlines between the beds to provide protection from others coughing, sneezing, and other symptoms. (Doc. 37-1 at 4). He further alleges that the dining tables are square tabletops with four seats attached, thus "noncompliant with CDC social distancing guidelines." (Doc. 12 at 3). He claims that Defendants have spray painted "Xs" on the floor of the dining hall, which at best are three to four feet apart, so inmates will separate themselves, but contends this falls short of the CDC recommendation of six feet apart. (*Id*. at 3). Moreover, he alleges that social distancing is not enforced throughout the facility because Defendant Cooks said, "it is too crowded to space inmates and takes too long to serve inmates food and canteen." (*Id*.).

Charest asserts that only symptomatic inmates are tested for COVID-19 (Doc. 37-1 at 7) and, if positive, isolated in Fountain's chapel with other active cases. (Doc. 37 at 3). No guard or medical staff is present in the chapel, and the patients are checked on once or twice by a nurse and three times "during feeding process." (Doc. 37-1 at 2). Also, when an inmate tests positive, Charest asserts he has been quarantined within his dorm, with

inmates that are "coughing, sneezing, with sickness." (Doc. 37-1 at 2). This has occurred three times from January 2021 through August 2021. (*Id.*). Charest challenges this "cohorting type quarantine" is against CDC guidelines. (*Id.*). Furthermore, Charest alleges both that no vaccines have been given as promised in Fountain's October, November, December 2020 and January 2021 newsletters (Doc. 30 at 8) and that only 20% of Fountain's population is vaccinated. (Doc. 37 at 6). He also claims that "Warden Butler, said virus shots are being offered, to the 80% before visitations return, or any free world persons, lawyers, are permitted into Fountain." (*Id.*).

As to his personal vulnerability and risk of COVID-19, Charest reasserts that his age and underlying medical conditions as recognized by the CDC place him at risk of dying from COVID-19. (Doc. 27-1 at 2). He claims generally that "[o]lder persons due to impaired immunity, aging, with hypertension (as Charest) have an unappreciated risk for severe disease" and higher risk in prison, (doc. 37 at 9; doc. 37-1 at 7) and, specifically, that he suffers from lower back injuries and related pain, high blood pressure, gastroesophageal reflux, carpal tunnel syndrome, enterocolitis, irritable bowel syndrome, and previous surgical repair of right foot/ankle. (Doc. 37 at 6). Throughout his pleadings, Charest relies on the "Declaration of Dr. Michael Puisis Concerning the Risk of the Spread of COVID-19 in the Alabama Prison System", in support that he faces a substantial risk of serious harm to his health and safety. (Doc. 16 at 42-46). In this unsworn document, Dr. Puisis, who served as a medical expert in the matter of *Braggs v. Dunn,*[14] provides an overview of the transmission of the COVID-19 virus, the overall conditions (namely

---

[14]     *Braggs v. Dunn*, 2:14cv601-MHT (WO), filed in the United States District Court, Middle District Alabama, Northern Division.

overcrowding) of Alabama prisons, and the heightened risk of contagious diseases in prisons. (*Id*.).

Charest has also put forth two supporting inmate affidavits, which are summarized as follows:

Inmate David Lucas affirms that he arrived at Fountain from St. Clair Correctional Facility in October 2020 and has never received verbal education by ADOC or medical staff while imprisoned, specifically no instructions on social distancing "because it's impossible." "ADOC did pass out bars of Safeguard soap as anti-bacterial soap at one time, they would give an inmate one bar per week. That did not last long I haven't seen a bar of Safeguard soap in months. They now give use the usual State made soap." Cleaning supplies are never passed out at Fountain. At Fountain, 5 dispensing stations were set up for liquid disinfectant for hand washing, for approximately 2 months. Once the disinfectant ran out, it was never refilled. Four portable sinks with water and paper towels were set up. After the first few re-fillings, ADOC has failed to refill the sinks. Maintains all chronic care appointments were cancelled. There has never been any type of Intensive cleaning performed by the captain and two or three inmates. No inmate, under the captain's direction has ever come to ask to clean the bed area with disinfectant. No kitchen steward has ever come to supervise the cleaning of the dorm bathroom. Masks made from sheets have been passed out to inmates, but not N95 grade masks. If an inmate tests positive, that inmate is placed in the chapel, with other infected inmates, for three weeks. No individual isolation. First, they don't have a facility where they can isolate you from other inmates. Only medical monitoring received is a temperature check, once a day, if you test positive. In his experience with ADOC, Inmate Lucas avers that "ADOC has shown to be a prolific liar when it comes to Court and Legal issues because they are confident that the justices in the Federal court are so lazy and don't give a damn about an inmates complaint, they will never take the time to go and check out the place complained of by the inmate", and challenges the court to visit the prison and see the truth. (*See* Doc. 37-2).

Inmate James Johnson avers that he arrived at Fountain around January 2021 and has received no updated communication regarding COVID nor CDC guidelines for combatting Covid. He further avers he has not received any disinfectant, soap, spray or such CDC recommended products to aid in protection from covid virus. He declares he has witnessed inmates removed from Dorm G, who tested positive for COVID-19, but no one came in and sanitized the inmate's bed/ bunk prior to assigning another inmate to the empty bed. Inmate Johnson maintains that he sleeps within two to three feet of four other inmates, that he has received a mask, but no cleaning supplies for his individual living area. (*See* Doc. 37-3).

In response to the motion for summary judgment, Charest attaches letters he wrote to Governor Kay Ivey and Warden Cooks, dated March 1, 2020, regarding "Notification

of imminent Covid19 dangers lurking inside ADOC's prisons, and [his] request for protection, testing, safety." (Doc. 37-4 at 1, 4). Charest requests that Governor Ivey "alert, contact the ADOC Commissioner J. Dunn, Warden Cooks, and . . . Wexford, Inc., and make sure we get the reasonable protections too" while imprisoned. (*Id.* at 1). As to Warden Cooks, he asks that she allow inmates to take "reasonable measures . . . upon themselves" to avoid contracting the virus; specifically, he requests being able to "place bed sheets between our racks, beds less than two-three (2-3) feet apart", since social distancing is not possible. (*Id.* at 4). He also states that when inmates visit the healthcare unit, they are sent away and told to sign up for sick call, which is "weeks later" and includes copays. (*Id.*).

In total, Charest disputes the veracity of Defendants' Special Report and facts pleaded to the court, maintains that Defendants have failed to carry their summary judgment burden, and declares that if he "catches Covid 19 or its counterpart Delta variant, death is in fact imminent!" (Doc. 37-1 at 8).

## IV.     Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'") (citation omitted).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing or pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor.

*ThyssenKrupp Steel USA, LLC v. United Forming, Inc.*, 926 F. Supp. 2d 1286, 1290 (S.D. Ala. 2013) (internal citations omitted).

The requirement to view the facts in favor of the nonmoving party extends only to "genuine" disputes over material facts. *Garczynski*, 573 F.3d at 1165. "A genuine dispute requires more than 'some metaphysical doubt as to material facts.' " *Id*. (citations omitted). A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence in order to defeat a motion for summary judgment. *Id.* In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing

parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007); *see also Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) ("In cases where opposing parties tell different versions of the same events, one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations.").

## V.   DISCUSSION.

### A.  Standing to Sue.

Defendants contend that Charest lacks standing to sue for injunctive relief without a current injury.  (Doc. 25 at 13).

"Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury." *Williams v. Bd. of Regents of University System of Georgia*, 477 F.3d 1282, 1302 (11th Cir. 2007) (citation omitted); *see also Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir.2004) ("For a plaintiff seeking prospective relief to have standing, he must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future.") (citations and internal quotation marks omitted); *Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263, 1274 (11th Cir.2003) ("where a plaintiff seeks these types of prospective relief, it must demonstrate a real and immediate threat of future injury to satisfy the injury in fact requirement") (citations and internal quotation marks omitted).

Plaintiff has alleged facts indicating the imminent risk of contracting COVID-19 and the likelihood of severe harm if infected.  On similar facts, the Supreme Court has previously held that a prisoner's Eighth Amendment claim could be based upon possible future harm to health, declaring:

> We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year. In *Hutto v. Finney,* 437 U.S. 678, 682, 98 S. Ct. 2565, 2569, 57 L. Ed. 2d 522 (1978), we noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease. This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed. We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery. Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms.

> That the Eighth Amendment protects against future harm to inmates is not a novel proposition. The Amendment, as we have said, requires that inmates be furnished with the basic human needs, one of which is "reasonable safety." *DeShaney, supra,* 489 U.S., at 200, 109 S. Ct., at 1005. It is "cruel and unusual punishment to hold convicted criminals in unsafe conditions." *Youngberg v. Romeo,* 457 U.S. 307, 315–316, 102 S. Ct. 2452, 2457–2458, 73 L.Ed.2d 28 (1982). It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them. The Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event. Two of them were cited with approval in *Rhodes v. Chapman,* 452 U.S. 337, 352, n. 17, 101 S. Ct. 2392, 2402, n. 17, 69 L. Ed. 2d 59 (1981). *Gates v. Collier,* 501 F.2d 1291 CA5 1974), held that inmates were entitled to relief under the Eighth Amendment when they proved threats to personal safety from exposed electrical wiring, deficient firefighting measures, and the mingling of inmates with serious contagious diseases with other prison inmates. *Ramos v. Lamm,* 639 F.2d 559, 572 (CA10 1980), stated that a prisoner need not wait until he is actually assaulted before obtaining relief.

*Helling v. McKinney*, 509 U.S. 25, 33–34, 113 S. Ct. 2475, 2480–81, 125 L. Ed. 2d 22 (1993). Given the ongoing nature of the COVID-19 pandemic and the facts put forth by Plaintiff, the undersigned finds Plaintiff has standing to pursue his Eight Amendment action. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, (2014) (Allegations of increased risk of harm (or future injury) establish standing "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.").

**B. Defenses and Immunity from Suit.**

Charest has brought this action pursuant to 42 U.S.C. § 1983. To state a cause of action under § 1983, a plaintiff must allege that (1) there was an act or omission that deprived him of a constitutional right, privilege, or immunity and (2) the act or omission was committed by a person acting under color of state law. *Martinez v. Burns*, 459 F. App'x 849, 850-851 (11th Cir. 2012) (citing *Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005)).[15] While there is no dispute that Plaintiff is suing pursuant to the Eighth Amendment and that Defendants were acting under color of state law, the capacity in which Plaintiff brings this suit against the Defendants matters, and Plaintiff fails to specify in his Complaint whether suit is being brought against Defendants in their official or individual capacities.

"On the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985). However, more is required in an official capacity § 1983 action. In such a case,

---

[15]     "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

"a governmental entity is liable under § 1983 only when the entity itself is a moving force behind the deprivation; thus, in an official-capacity suit the entity's policy or custom must have played a part in the violation of federal law." *Kentucky,* 473 U.S. at 166. (internal quotations and citations omitted).  Furthermore, the capacity in which a person or entity is sued determines the availability of certain defenses to suit.[16]

### 1. Official Capacity.

Upon review of the Complaint and subsequent pleadings, it is obvious that Plaintiff is suing Defendants Governor Kay Ivey and Warden Mary Cooks in their official capacities - he specifically states such in one pleading;[17] he seeks only declaratory and injunctive relief (failing to request monetary damages in any pleading)[18] and directs all complaint

---

[16]     As the Court of Appeals for the Eleventh Circuit has observed:

> The main concern of a court in determining whether a plaintiff is suing defendants in their official or individual capacity is to ensure the defendants in question receive sufficient notice with respect to the capacity in which they are being sued. In general, plaintiffs have a duty to make plain who they are suing and to do so well before trial. However, plaintiffs are not required to designate with specific words in the pleadings that they are bringing a claim against defendants in their individual or official capacities, or both. When it is not clear in which capacity the defendants are sued, the course of proceedings typically indicates the nature of the liability sought to be imposed. Thus, while it is clearly preferable that a plaintiff state explicitly in what capacity defendants are being sued, failure to do so is not fatal if the course of proceedings otherwise indicates that the defendant received sufficient notice.

*Young Apartments, Inc. v. Town of Jupiter, FL*, 529 F.3d 1027, 1047 (11th Cir. 2008) (internal citations and quotations omitted).

[17]     In Charest's Amended Complaint, which was denied by this Court (*see* Docs. 32, 34), Plaintiff asserts that "in his original filing" he named as defendants Governor Kay Ivey and Warden Mary Cooks and "sued [them] in their <u>official capacity</u>."  (Doc. 26 at 1) (emphasis in original).

[18]     See Doc. 30 at 6, confirming Charest is "seeking no money damages".

allegations at "ADOC defendants" rather than any specific or named defendant.  Thus, Defendants Ivey and Cooks are being sued in their official capacity by virtue of their positions, respectively, as Governor of Alabama and Warden of an Alabama Correctional Facility. As such, Defendants are entitled to sovereign immunity, pursuant to the Eleventh Amendment.

It is well-established that, "suits against an official in his or her official capacity are suits against the entity the individual represents." *Parker v. Williams*, 862 F.2d 1471, 1476 n.4 (11th Cir. 1989), *overruled on other grounds in Turquitt v. Jefferson Cnty.*, 137 F.3d 1285, (11th Cir. 1998); *see Monell v Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978) ("[O]fficial capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.").  Thus, to the extent that Plaintiff's claims are against the Defendants in their official capacities, his claims are effectively claims against the State of Alabama. The Supreme Court has held that states and state officials are not "persons" subject to liability pursuant to 42 U.S.C. § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989). Further, pursuant to the Eleventh Amendment of the United States Constitution, a state's own citizens may not sue unless the state consents to suit or Congress acts to abrogate immunity. *See Carr v. Florence*, 916 F.2d 1521, 1524-25 (11th Cir. 1990). There is nothing before the Court that suggests that the State of Alabama has consented to the suit or that Congress has acted to abrogate immunity. Under the Eleventh Amendment, state officials sued for damages in their official capacities are immune from suit in federal court, *Jackson v. Ga. Depart. of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994); however, claims for prospective relief are not so barred.  *Ex parte Young,* 209 U.S. 123, 155–56, 28 S. Ct. 441, 452, 52 L. Ed. 714 (1908) (a suit for injunctive relief

provides a narrow, but well-established, exception to Eleventh Amendment immunity). Thus, to the extent that each of these defendants may be sued in her official capacity for monetary relief, Defendants are immune from suit. To the extent Plaintiff seeks prospective relief from any of the proposed defendants having proximity to and responsibility for a challenged state action, the claims may go forward.

### 2. Individual Capacity.

Defendants have asserted immunity defenses in their Answer and Special Report reflecting potential liability in their individual capacities.[19] (*See* Doc. 25 at 10-12). Therefore, to the extent that Plaintiff sues Defendants in their individual capacities for money damages, he is barred by the PLRA and potentially by the doctrine of qualified immunity, as asserted by the Defendants.

The Prisoner Litigation Reform Act ("PLRA") states, "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody . . ." 42 U.S.C.A. § 1997e(e). Here, Plaintiff has made no claim that physical injury related to his constitutional claim. Consequently, to the extent he attempts to recovery money damages, he is barred.

Second, "[q]ualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (*quoting Harlow v. Fitzgerald*,

---

[19]     There is scarce indication in the record suggesting Charest's intent to sue Defendants in their individual capacities. In a single pleading, a motion for preliminary injunction, he states he is suing Governor Ivey "both individually - and – officially." (Doc. 16-1 at 2). With this, however, and Defendants asserted immunity defenses, the court will proceed to address Defendants' potential individual liability.

457 U.S. 800, 818 (1982)). "[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority." *Harbert International v. James,* 157 F.3d 1271, 1281 (11th Cir.1998). The burden then shifts to the plaintiff to show that the defendant's conduct "violated a clearly established statutory or constitutional right." *Grayden v. Rhodes,* 345 F.3d 1225, 1231 (11th Cir. 2003). However, "[b]ecause qualified immunity is only a defense to personal liability for monetary awards resulting from government officials performing discretionary functions, qualified immunity may not be effectively asserted as a defense to a claim for declaratory or injunctive relief." *Ratliff v. DeKalb County,* 62 F.3d 338, 340 n. 4 (11th Cir.1995); *accord Swint v. City of Wadley,* 51 F.3d 988, 1001 (11th Cir.1995); *D'Aguanno v. Gallagher,* 50 F.3d 877, 879 (11th Cir.1995). Thus, the Court will proceed with the question of whether a constitutional violation has occurred.[20]

## C. Supervisory Liability – Defendant Governor Kay Ivey

"It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)

---

[20]     Contrary to Defendants' contention that they are entitled to qualified immunity because no clearly established law exists pertinent to the claims asserted against them, due to the novelty of the COVID-19 virus (*see* Doc. 25 at 13), the court disagrees. No doubt, existing precedent exists to clearly establish the rights of inmates to protection from heightened exposure to serious communicable disease. S*ee, e.g. Helling v. McKinney*, 509 U.S. 25, 33 (1993) (finding prison officials may not "be deliberately indifferent to the exposure of inmates to a serious, communicable disease" under the Eighth Amendment.). Accordingly, "[t]he law does not support a finding of qualified immunity for government officials who fail to protect individuals in their custody from a new serious communicable disease, as opposed to a serious communicable disease of which they were previously aware. To hold otherwise as a matter of law would provide qualified immunity to Defendants even if they had done nothing in response to the COVID-19 pandemic." *Maney v. Brown*, Civ. Action No. 6:20-cv-00570, 2020 WL 7364977, *5-6 (D. Ore. Dec. 15, 2020).

(internal quotation marks and citation omitted).  If a supervisor's liability cannot be established based on the supervisor's personal participation in the complained acts, a plaintiff must show a causal connection between the supervisor's actions and the alleged constitutional deprivation.  *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990).

> A causal connection may be established when: 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so; 2)  a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

*Valdes v. Crosby*, 450 F.3d 1231, 1237 (11th Cir. 2006) (citing *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)).  A custom is established by showing "a longstanding and widespread practice [such that it] is deemed authorized by the policymaking officials because they must have known about it but failed to stop it."  *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (A custom requires showing a practice so settled and permanent that it takes on the force of law).  "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences."  *West Tillman*, 496 F.3d 1321, 1329 (11th Cir. 2007) (quotation marks and citations omitted).

As to the claims against Governor Kay Ivey, that she "failed to protect, provide preventative supplies and services, testing of Covid-19" and acted with deliberate indifference to the threat of imminent physical danger/death" posed by Covid-19" (doc. 1 at 11), Charest has failed to allege Defendant Ivey participated in or has a causal connection to any of the alleged violations of his constitutional rights regarding COVID-19 conditions at Fountain.  Charest's only mention of Governor Ivey is that he wrote her letter at the

beginning of the COVID outbreak in this country. (Doc. 37-4 at 1). The letter, however, falls drastically short of connecting Defendant Ivey to Charest's complaint allegations, as the letter contains no more than a generalized fear of the COVID-19 virus and a request that inmates be provided "reasonable protections too." (*Id.*). The letter utterly fails to imply personal participation nor causally connect Defendant Ivey to Charest's claim of deliberate indifference to his health or safety. (*See* Doc. 37-4 at 1). Merely holding Defendant Ivey liable because she is Governor, without any facts which support an inference that she knew of a risk to Charest or acted deliberately toward Charest's health or safety will not suffice. To the extent Charest seeks to hold Defendant Ivey responsible for prison employees' failures to follow appropriate COVID-19 guidelines or provide adequate protection, simply because she is governor, fails for the same reason. Accordingly, Charest has failed to state a claim upon which relief may be granted, and it is recommended that Summary Judgment be **GRANTED** in favor of Defendant Governor Kay Ivey and that she be **DISMISSED** from this case in its entirety.

### D.  Eighth Amendment Claim – Defendant Warden Mary Cooks.

No reader, at this date, will be unfamiliar with COVID-19, the respiratory illness which swept across the globe in 2020 creating a pandemic, and remains ongoing.[21] As of

---

[21]     This Court takes judicial notice of certain facts regarding COVID-19 that are posted by the CDC on its official website. *See* Fed. R. Evid. 201; *Qui Yun Chen v. Holder*, 715 F.3d 207, 212 (7th Cir. 2013) ("A document posted on a government website is presumptively authentic if government sponsorship can be verified by visiting the website itself...."); *see also Gent v. CUNA Mut. Ins. Soc.*, 611 F.3d 79 (1st Cir. 2010) (taking judicial notice of facts from the CDC website, as it is a federal agency under the Department of Health and Human Services).

COVID-19 is caused by a novel coronavirus, called SARS-CoV-2, which has not previously been seen in humans. It is thought to spread mainly from person-to-person through respiratory droplets produced when an infected person coughs or sneezes. For more information on COVID-19, *see Coronavirus (COVID-19)*, U.S. Centers for Disease

the writing of this report and recommendation, at least 72,310,575 people in the United States have contracted the virus and 870,195 have died from it.[22]  It is well established, however, that not all persons contracting COVID-19 are equally at risk for serious complications - with age and certain underlying medical conditions creating higher risks for severe COVID-19 illness.[23]  Notably, it is the CDC that has guided this country throughout the novel virus, collecting data and statistics, recommending preventative measures of protection from the contracting the virus, and continually updating guidelines for the public as new information is learned.  In March 2020, the CDC first published interim guidance to correctional facilities and detention centers on how to combat the COVID-19 virus,[24] which Defendant utilized in preparing for and preventing the spread of COVID-19 at Fountain.  It is regarding compliance with these CDC guidelines that Charest rests most of his allegations, namely that Defendant is not following the CDC's recommendations, thus they are acting with deliberate indifference to his health and safety.

The court pauses to recognize the significance of the CDC's COVID-19 prevention guidelines for public health but notes that compliance (or noncompliance) with CDC

---

Control and Prevention, https://www.cdc.gov/coronavirus/2019-nCoV/index.html (last visited January 27, 2022).

[22]    *See COVID Data Tracker*, U.S. Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited January 27, 2022).  Within the Alabama prisons, there have been 2,921 confirmed inmate cases of COVID-19, since the start of the pandemic, and 70 inmates have died from the virus. *See ADOC COVID-19 Updates*, Alabama Department of Corrections, http://www.doc.alabama.gov/covid19news (last visited January 27, 2022).

[23]    *See COVID-19 Medical Conditions*, U.S. Centers for Disease Control and Prevention,https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited January 27, 2022).

[24]    *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited January 27, 2022).

guidelines is not dispositive of Charest's Eight Amendment claims.  To hold otherwise would essentially abdicate the court's duty to answer questions about what our society is willing to accept (or not) in the name of punishment to the CDC, an informal government agency.[25]  *Cf., Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) ("[W]e have held repugnant to the Eight Amendment punishments which are incompatible with the evolving standards of decency that mark the progress of a maturing society.") (internal quotation omitted); *see also Mays v. Dart,* 974 F.3d 810, 823 (7th Cir. 2020), *cert. denied*, 142 S. Ct. 69, 211 L. Ed. 2d 9 (2021) (Qualifying that the CDC Guidelines—like other administrative guidance—do not themselves set a constitutional standard, while noting the CDC Guidelines provide the authoritative source of guidance on prevention and safety mechanisms for a novel coronavirus in a historic global pandemic where the public health standards are emerging and changing.).

Accordingly, this report will review and refer to CDC recommendations as guidance in evaluating the reasonableness of Defendant's actions, but as with all Eighth Amendment claims, the issue remains squarely one of deliberate indifference to a known risk of harm - not a measure of Defendants' compliance with CDC guidelines.

Prison officials violate the Eighth Amendment[26] through "the unnecessary and wanton infliction of pain." *Farmer v. Brennan,* 511 U.S. 825, 836, 114 S. Ct. 1970, 128 L.

---

[25]    See About CDC 24-7, *Mission, Role and Pledge*, Centers for Disease Control and Prevention, https://www.cdc.gov/about/organization/mission.htm (last visited January 27, 2022) to view the creation and mission of the CDC agency. *See also, Chapter Four Conditions of Confinement, Covid-19, and the CDC*, 134 Harv. L. Rev. 2233, 2240 (2021) (discussing the role of CDC guidance into constitutional law COVID-19 cases).

[26]    "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." US CONST. amend. VIII; *see also Robinson v. California*, 370 U.S. 660, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1972) (The Eighth Amendment is applicable to the states through the Fourteenth Amendment.).

Ed. 2d 811 (1994). The Supreme Court has defined wantonness as "deliberate indifference to a substantial risk of serious harm to a prisoner." *Id.* Thus, to establish an Eighth Amendment violation, a prisoner must prove both an objective and a subjective component, whether the treatment received by the prisoner is characterized as "inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the deliberate indifference standard. . . ." *Helling*, 509 U.S. 25, 32.

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

*Sims v. Mashburn*, 25 F.3d 980, 983 (11th Cir. 1994). To prevail, a plaintiff must prove that there was "a substantial risk of serious harm," that the defendant was subjectively deliberately indifferent to that risk. *Farmer*, 511 U.S. at 832-34. In defining "deliberate indifference," the Supreme Court has stated:

> With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness. *See e.g., LaMarca v. Turner*, 995 F.2d 1526, 1535 (CA11 1993). . . . It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.

*Id.* at 836. Thus, the Court concluded that the "subjective recklessness" standard of criminal law is the test for "deliberate indifference" under the Eighth Amendment. *Id.* at 839-40. Under this test, there is no liability for "an official's failure to alleviate a significant risk that he should have perceived but did not . . . ." *Id.* at 838. It is not enough that an inmate proves that the defendant should have known of the risk, but did not, as actual knowledge is the key. *See, e.g., Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996).

> In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the 1983 risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure "reasonable safety," . . . a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions. Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Farmer*, 511 U.S. at 844–45 (internal quotations and citations omitted).

Here, the parties do not dispute that COVID-19 presents an objectively substantial risk of serious harm. (Doc. 25 at 3). It is disputed, however, whether Charest, personally, faces an objectively serious risk of harm from COVID-19. Defendant has presented evidence in her motion (through the declaration of Dr. Hood) that Charest is not a person at high risk for severe illness from COVID-19, namely Charest is not over 65 years of age, nor does he suffer from a serious underlying medical condition identified by the CDC as potentially creating a higher risk for severe illness.[27] In response to this motion, Charest alleges for the first time that he suffers from high blood pressure; but fails to allege facts describing his condition or indicating the severity of his hypertension, including when he developed hypertension, if it is being treated, if it is under control, etc. (Doc. 37 at 6; Doc. 37-1 at 7). In support of his assertion, he puts forth the unsworn opinion of Dr. Michael Puisis that the general conditions of Alabama prisons (namely overcrowding, understaffing, and sanitation and hygiene deficiencies) places inmates at risk of harm from COVID-19 infections. (Doc. 16 at 42-46). Dr. Puisis further opines that "people over age 65 and persons with impaired immunity *may have* a higher probability of death if they are

---

[27]    Defendant refers to the CDC guidelines from May 6, 2020 identifying serious underlying medical conditions as "chronic lung disease, serious heart conditions, immunocompromised, severe obesity, diabetes, chronic kidney disease undergoing dialysis, and liver disease." (Doc. 13-3 at 4).

infected. . . . It has recently been reported that younger patients with cardiovascular disease or hypertension may have unappreciated risk for severe disease."[28]   (Doc. 16 at 46) (emphasis added).   The unsworn statement of Dr. Puisis, however, is not properly submitted under *Federal Rule of Civil Procedure* 56(c) and cannot be relied on to defeat summary judgment, *see Adickees v. S.H. Kress & Co*., 398 U.S. 144, 158 n.17, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970) (unsworn statements are not admissible at summary judgment stage of proceedings); *Carr v. Tantangelo*, 338 F.3d 1259, 1273 n.27 (11th Cir. 2003) (court may not consider unsworn statements when ruling on motion for summary judgment).   Nevertheless, drawing all inferences in favor of Charest, the court takes judicial notice of the June 25, 2020 CDC update, which adds high blood pressure as a "condition[] that **might** increase a person's risk of severe illness."   *CDC updates, expands list of people at risk of severe COVID-19 illness*,   CDC   Newsroom, https://www.cdc.gov/media/releases/2020/p0625-update-expands-covid-19.html   (last visited January 30, 2022) (emphasis in original).[29]   The conditions labeled by the CDC as

---

[28]      According to Dr. Puisi's "declaration", he is a physician who has worked in correctional medical for 35 years.   He served as a medical expert in the matter of *Braggs v. Dunn*, a class action against the ADOC and was retained to assess and opine on the medical care provided to incarcerated people in ADOC custody.   In 2016, Dr. Puisi completed a systemic review of the ADOC medical program, including review of adequacy of housing units, inspection of medical clinics, equipment, supplies, and sanitation, and monitoring functions related to infectious and contagious disease.   (Doc. 16 at 42).

[29]      The current CDC guidelines, as related to this issue state, "Having heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly high blood pressure (hypertension) can make you more likely to get severely ill from COVID-19." *Medical Conditions*, Heart Conditions, COVID-19, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html   (last visited January 31, 2022).

"might be" are so listed "because 'of limited data and information' about the condition's impact and whether it increases the risk." *United States v. Harris*, 989 F.3d 908, 912 (11th Cir. 2021) (citing *People with Certain Medical Conditions,* Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. "And the CDC distinguishes those conditions from ones that mean an adult is "at increased risk." *Id*. Thus, Charest has failed to demonstrate that he faces an objectively substantially serious risk of harm from COVID-19. "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–250 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990).

Assuming Charest could show that COVID-19 objectively presents a substantial risk of serious harm to him, Defendant has clearly demonstrated, as presented in her motion for summary judgment, that she has taken measures to implement precautions to protect Charest (and other inmates) from the COVID-19 virus, as recommended by the CDC. (*Compare* Docs. 13 and 25 to Doc. 13-2 at 14-39). Accordingly, Defendant Cooks has satisfied her burden of showing that she did not "disregard [] the risk [of COVID-19] by conduct that is more than mere negligence." *Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020) (citing *Farmer*, 511 U.S. at 836). Stated another way, Defendant Cooks has shown that she did not recklessly disregard the COVID-19 risk to Charest or other inmates. *Id*. Thus, the burden shifts to Charest to show otherwise.

33

Viewing the evidence in the light most favorable to Charest,[30] the court examines

the record, as a whole, to determine what did the Defendant do in response to the risk(s)

posed by the COVID-19 virus? And was that response reckless?

It is clear from the record that Defendant has posted educational written

communication about the symptoms of COVID-19, proper hygiene practices, and social

distancing practices have been distributed to Fountain inmates, as recommended by the

CDC. Moreover, these written communications include numerous, simple pictures

explaining necessary COVID-19 preventive strategies which would aid in disseminating

the information to those who struggle to or cannot read. (Doc. 13-2 at 9, 19, 41-48; Doc.

37 at 9).

Masks have been provided to inmates and staff, as recommended by the CDC. Also,

information has been given to the inmates on how to properly wear the mask and clean and

store the mask. (Doc. 13-2 at 57).

In-person visitations and court appearances were ceased to limit the threat of

COVID-19 entering the facility from external sources (Doc. 37 at 6), as recommended by

the CDC. (Doc. 32-2 at 26-27). With ADOC staff being the only persons to come and go

from Fountain, Defendant planned for staff absences, prevention practices, and confirmed

staff cases, as recommended by the CDC. (Doc. 13-2 at 20, 25-26). Standard questionaries

---

[30]     The undersigned views the evidence in the light most favorable to Charest, the
nonmovant. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir.
2003) (At the summary judgment stage, "[t]he evidence, and all reasonable inferences,
must be viewed in the light most favorable to the nonmovant...."); *Rachel v. City of Mobile*,
112 F. Supp. 3d 1263, 1274 (S.D. Ala. 2015), *aff'd*, 633 F. App'x 784 (11th Cir. 2016)
("Therefore, the [non-movant's] version of the facts (to the extent supported by the record)
controls, though that version can be supplemented by additional material cited by the
[movants] and not in tension with the [non-movant's] version.").

were implemented for screening staff entering the facility or who called in sick, to evaluate whether it was safe for them to enter the facility and/or return to work. (Doc. 13-2 at 50-53).

Medical copays have been eliminated for inmates seeking medical treatment, as recommended by the CDC.[31]  (Doc. 13-2 at 22).

Soap has been provided to inmates for increased handwashing.  (*See* Doc. 37-2; Doc. 13-2 at 21, 23). Though Charest denies in pleadings that adequate amounts of "hand washing disinfect, soap, liquids, nor ample amounts of cleaning supplies and aerosols" are being provided "as required by CDC guidelines" (Doc. 37-1 at 2), he admits in response to this motion (through the affidavit of Inmate Lucas) that while the inmates are no longer provided Safeguard antibacterial soap, they do receive "the usual State made soap" for handwashing.  (Doc. 37-2 at 1).  Notably, the CDC maintains there is no benefit to antibacterial soap over regular soap for COVID-19 prevention handwashing.[32]  Charest further acknowledges in response to this motion that bleach is being distributed to clean the high-risk communal areas of his dorm - the showers and restrooms.  (Doc. 37-1 at 2,

---

[31]     Charest alleges that it took a week to be seen by a doctor. (Doc. 37-1 at 7).  To the extent he attempts to assert a claim of deliberate indifference to his medical care, he has failed to state a claim.  Namely, Charest gives no indication that his request to be seen was due to COVID-19 symptoms, that he suffered a serious medical need, or that his injury or need worsen due to the delay.  In fact, he fails to articulate what his medical need was at all.  Accordingly, he has failed to establish an Eighth Amendment claim for denial or delay or medical care.

[32]     According to the CDC, there is no added benefit to antibacterial soap over the use of plain soap and warm water to wash hands.  Indeed, some studies have indicated that antibacterial soap may contribute to antibiotic resistance.  *See* Hand Hygiene FAQs, *Handwashing Steps*, CDC, https://www.cdc.gov/handwashing/faqs.html  (last visited January 20, 2022).

4).  And, guards are allowed to carry personal hand sanitizer, [33] (Doc. 37 at 7), as recommended by the CDC.  (Doc. 32-2 at 21).  Here, where Plaintiff essentially disagrees with the efficacy of what Defendant has provided or simply prefers different cleaning items, such allegations are insufficient to support a claim of cruel and unusual punishment, as they fall short of establishing the subjective element of deliberate indifference.[34]

There is no debate that six-foot social distancing, as ideally recommended by the CDC, is impossible at Fountain.  (Doc. 32-2 at 24).  However, as suggested by the CDC, tailored strategies have been implemented at varying levels, as acknowledged by Charest.  Charest affirms that inmates have been allowed to create makeshift curtains out of bed sheets to separate their beds.  (Doc. 37-1 at 4) (Notably, this is the one suggestion/request he made to Warden Cooks in his March 1, 2020, letter at the start of the pandemic. (*See*

---

[33]    As to Charest's claims that the inmates are not given alcohol based liquid hand sanitizer, which Defendants have declared is restricted for security reasons, namely, "its potential for misuse in creating drinking alcohol. (Doc. 13 at n.17).  The CDC has acknowledged the potential for restrictive use as alcohol based liquid hand sanitizer is a known security concern for prisons. (*See* Doc. 32-2 at 23).

[34]    Likening the reasoning to Eighth Amendment claims related to medical treatment, it is well established that a mere disagreement with the medical treatment received will not rise to the level of a constitutional violation.  *See, e.g., Harris v. Thigpen,* 941 F.2d 1495, 1505 (11th Cir.1991) ("Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment.").  "When a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." *Waldrop v. Evans,* 871 F.2d 1030, 1035 (11th Cir.1989).  Similarly, Charest acknowledges he has received soap for personal handwashing and prevention of COVID as well as bleach to clean the high trafficked communal areas of his dorm.  Without more, it cannot be said that Defendant acted recklessly here.  *Cf.*, *Mays v. Dart*, 974 F.3d 810, 820 (7th Cir. 2020), *cert. denied*, 142 S. Ct. 69, 211 L. Ed. 2d 9 (2021) ("When evaluating reasonableness, ... courts must afford prison administrators 'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'") (quoting *Henry v. Hulett*, 969 F.3d 769, 783 (7th Cir. 2020) (en banc) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).

37-4 at 4)).  Also, Defendant has placed marked "X's" on the floor of the dining hall to help socially distance inmates, as they eat with their dormitory. (Doc. 37-1 at 3).  Charest maintains that Captain Knight screamed at an inmate to "get six feet away" from her (Doc. 1 at 4), evidencing that attempts to enforce social distancing are being implemented.

Inmates who exhibit symptoms of COVID-19 are tested, as recommended by the CDC.[35]  (Doc. 37-1 at 7).

Protocols are in place for active COVID cases and cases of exposure.  The CDC recommends the isolation of persons who test positive for COVID-19 and quarantine of those who have been knowingly exposed to the virus. (Doc. 32-2 at 28).  The record reflects inmates with confirmed cases of COVID-19 are housed together in the prison's chapel, and inmates who have been exposed are quarantined with their dormitory.  While Charest takes issue with these procedures, seemingly arguing that individual isolation is necessary but acknowledging it is impossible at Fountain, the CDC has made clear that the practice of "cohorting" (grouping individuals together in isolation and/or quarantine) is acceptable as a valid alternative in prison settings, where individual isolation is impossible.  (Doc. 13-2 at 16, 29, 32-34).

Also, inmates and staff are being offered and receiving COVID-19 vaccines.[36]

---

[35]     To the extent Charest argues that non-symptomatic or all inmates should be tested, the court takes judicial notice of the CDC guidelines on testing and determines, the CDC does not and has not recommended that mass testing be conducting in detention facilities. *See* COVID-19, *Testing in Correctional & Detention Facilities*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html (last visited January 29, 2022).
         Furthermore, taking judicial notice of the ADOC website, 21,682 inmates have been tested for COVID-19, as of the drafting of this report.  *See* ADOC COVID-19 Preparedness Update, Alabama Department of Corrections, http://www.doc.alabama.gov/covid19news (last visited January 29, 2022).
[36]     When evaluating deliberate indifference in injunction cases, where it is possible

The Eleventh Circuit, in *Swain v. Junior*, 961 F.3d 1276, 1289 (11th Cir. 2020), has provided substantial guidance our evaluation of Charest's claim. The Court (in vacating a preliminary injunction ordering a Florida jail to take certain steps to curb the spread of COVID-19) reasoned, "[w]hile COVID-19 poses novel health risks to incarcerated inmates—and novel administrative challenges for jail and prison administrators—the law that the district court was bound to apply is well established." *Swain*, 961 F.3d at 1294. The Circuit Court concluded the trial judge wrongly determined that the increase in rate of infections and the "seeming impossibility" of meaningful social distancing measures were evidence of the defendant's deliberate indifference to inmates' health. *Id*. at 1287. Noting the "high bar" set by the Supreme Court in *Farmer v. Brennan* to establish deliberate indifference, the Eleventh Circuit emphasized that "[e]ven where 'prison officials ... actually knew of a substantial risk to inmate health or safety,' they may nonetheless 'be found free from liability if they responded reasonably to the risk'—and, importantly for present purposes, 'even if the harm ultimately was not averted.'" *Swain,* 961 F.3d at 1286-87 (quoting *Farmer*, 511 U.S. at 844). The Court noted this standard "incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Id.* (quoting *Farmer*, 511 U.S. at 844-45).

In reaching its decision, the Eleventh Circuit examined the measures defendants did take as well as the CDC's Guidance document. *Id.* at 1288-90. The CDC Guidance was

---

that a constitutional violation is likely to continue over time, courts are to consider the whole timeline of the suit – from filing to the judgment, including "prison officials' current attitudes and conduct." *Valentine v. Collier*, 993 F.3d 270, 286, 288 (5th Cir. 2021). Accordingly, the court takes judicial notice of the ADOC COVID-19 Updates, which confirm as of January 21, 2022, 12,160 inmate vaccinations had been administered in the Alabama prisons. *See* ADOC COVID-19 Preparedness Update, Alabama Department of Corrections, http://www.doc.alabama.gov/covid19news (last visited January 29, 2022).

noted by the Eleventh Circuit for "presuppos[ing] that some modification of its social-distancing recommendations will be necessary in institutional settings" and for providing on its first page, in bold, that it "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." *Id.* at 1288 (quoting CDC Guidance at 1). The CDC Guidance was acknowledged by the Eleventh Circuit for advising that six feet between inmates is the ideal, but distance will need to be tailored to the facility's space and the needs of the inmate population and staff. *Id.* The Court further recognized that to facilitate social distancing at the jail, the defendants had put tape on the floor to encourage social distancing in lines, arranged bunks so that inmates slept head to toe, and staggered patients going to the medical unit. *Id.* at 1288. Also, the defendants required staff and inmates to wear face masks, conducted screening for staff entering the facility, conducted daily temperature checks for all inmates, suspended all outside visitation, and provided disinfecting and hygiene supplies to all inmates. *Id.* at 1289. Given the implemented measures taken, the Eleventh Circuit stated, "[w]e simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by 'doing their best.' Because the defendants 'act[ed] reasonably,' they 'cannot be found liable' under the Eighth Amendment. *Id.* at 1289 (citing *Farmer* at 845).[37]

---

[37]  Similarly, courts outside this circuit have consistently held, in the context of the COVID-19 pandemic, that a plaintiff must provide more than conclusory allegations that defendants have not done enough to prevent or control the spread of the virus.  *See Valentine v. Collier*, 978 F.3d 154, 164 (5th Cir. 2020) (A facility's mere failure to comply with CDC guidelines does not rise to the level of a constitutional violation, and the Constitution does not require penal officials to implement "long-term changes" or sanitize facilities to "the maximum extent required to avoid the spread of COVID-19."); *Hope v. Warden*, 972 F.3d 310, 330 (3rd Cir. 2020) (rejecting petitioners' arguments that exposure to COVID-19 was *per se* unconstitutional and that the government must entirely eliminate

Here, the record simply does not support that Defendant Cooks has turned a blind eye and deaf ear to the COVID-19 pandemic and the risk it poses to inmates. *See Money v. Pritzker*, 453 F. Supp. 3d 1103, 1131-32 (N.D. Ill. 2020) (denying inmates' preliminary injunction motion because defendants listed steps they were taking in response to COVID-19 and "[t]he record simply does not support any suggestion that Defendants have turned the kind of blind eye and deaf ear to a known problem that would indicate total unconcern for the inmates' welfare") (quotation marks omitted); *Coates v. Arndt*, No. 20-C-1344, 2020 WL 6801884, at *2 (E.D. Wisc. Nov. 18, 2020) ("The plain fact is that the country is experiencing a pandemic and cases of COVID-19 are breaking out in prisons and communities across the country. This does not mean that the correctional officers in charge of those prisons are subjecting inmates to cruel and unusual punishment. People, both inside and outside prisons and jails, are contacting COVID-19. . . ."). As to whether or not Defendant Cooks' actions regarding the COVID-19 pandemic constitute deliberate indifference to Charest's serious medical needs, as would violate the Eighth Amendment, the undersigned concludes Charest has failed to carry his summary judgment burden.[38]  In particular, Charest has failed to establish that he is in a high-risk category for severe illness and that with this knowledge, Defendant so ignored the risk.  Again, Defendant has acted

---

their risk of exposure in order to comply with constitutional mandates); *King v. Fairman*, 997 F.2d 259, 261 (7th Cir. 1993) ("To sustain his constitutional claim, [plaintiff] must demonstrate something approaching a total unconcern for his welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm."); *Wilson v. Williams*, 961 F.3d 829, 842–43 (6th Cir. June 9, 2020) (rejecting the contention that "the [Bureau of Prisons] was deliberately indifferent to petitioners' health and safety because [its] actions have been ineffective at preventing the spread of COVID-19", where the evidence showed that the Bureau of Prisons had implemented numerous safeguards to combat the risk posed by COVID-19).

[38]     Notably, Charest has put forth no allegations that Defendant had knowledge of unconstitutional acts of other prison staff and recklessly failed to respond.

reasonably in implementing mitigating measures at Fountain to abate risk associated with COVID-19 virus, including testing for symptomatic inmates, isolation of confirmed COVID-19 cases, quarantine protocols for new inmates and inmates exposed to the virus, having staff stay home when they display symptoms of COVID-19, restriction on programs and visitation, distribution of soap, social distancing strategies where possible, provision of masks and information about the virus, as well as offering immunizations. *See Henry v. Hulett*, 969 F.3d 769, 783 (7th Cir. 2020) (en banc) ("When evaluating reasonableness, . . . courts must afford prison administrators 'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.' " ) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)).  Taken as a whole, the measures taken by Defendant to prevent or curb the spread of COVID-19 at Fountain do not satisfy the requisite state of mind indicative of subjective deliberate indifference, which has been likened by the Supreme Court to be recklessness, and Charest has failed to carry his burden to show otherwise.   Accordingly, it is recommended that summary judgment be GRANTED in favor of Defendant Cooks as to the Eighth Amendment claims asserted against her.

### E.  28 U.S.C. § 2244 Claim.

Charest asserts that his inability to file a second habeas petition pursuant to 28 U.S.C. § 2244 has effectively subjected him to a sentence of "death" due to the COVID-19 pandemic in the prison.  (Doc. 1 at 9).  He argues, "U.S. Congress's closing of the door to the United States District Court(s) is also a denial of access to court, when the State of Alabama violated Charest's rights against cruel and unusual punishment (8th Amend) and

deprivation of his right to due process and equal protection of the law (14th Amend) of U.S. Constitution." (*Id*.). He further alleges that "Congress failed to provide a means . . . when enacting 28 U.S.C. § 2244 to allow, permit Charest and other inmates to seek relief-remedy from . . . unconstitutional detention by the State of Alabama" in instances of "medical emergencies", like COVID-19. (Doc. 1 at 9, 11).

Charest's claim is a collage of key words and conclusory allegations which is ultimately meritless.

To the extent he challenges his ability to bring suit regarding the conditions of his confinement due to COVID-19, he has properly done so pursuant to his Eight Amendment claim asserted in this action. To the extent he seeks release from prison due to conditions of his confinement, such relief is not actionable in a § 1983 action and must be brought in a habeas petition. To the extent he seeks to declare § 2244's restrictions on successive habeas corpus petitions unconstitutional, the Supreme Court has already spoken. *Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L. Ed. 2d 827 (1996) (holding the restrictions of 2244(b)(1) and (2) are well within Congress' constitutional authority and do not amount to a suspension of the writ contrary to Article I, § 9). To the extent Charest asserts § 2244 has denied him access to the court, Charest must and fails to show that he sustained an actual injury (by showing he was frustrated or impeded in attacking his conviction, directly or collaterally, or in a civil rights action challenging his conditions of confinement); furthermore, he must and fails to show he was advancing a nonfrivolous claim. *See Lewis v. Casey*, 518 U.S. 343, 353-354, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996). To the extent Charest asserts § 2244 violates his rights to equal protection under the Fourteenth Amendment, he has failed to show or even allege that he was treated

differently from similarly situated people outside his protected class. *Wusiya v. City of Miami Beach*, 614 F. App'x 389, 393 (11th Cir. 2015) (citing *DeYoung v. Owens*, 646 F.3d 1319, 1327-28 (11th Cir. 2011)).

In attempting to discern Charest's claim, the undersigned notes there are "two main avenues" for prisoner to challenge their incarceration: (1) petitions for habeas corpus and (2) civil rights claims. *See Hill v. McDonough*, 547 U.S. 573, 579, 126 S. Ct. 2096, 165 L. Ed. 2d 44 (2006). "[T]he essence of a habeas corpus" "is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1973). The Supreme Court has explained that habeas petitions are traditionally brought to challenge the very "fact or duration" of a prisoner's confinement. *Id*. at 500. However, when a prisoner challenges the conditions of confinement, his suit is best brought in a § 1983 civil action. *See Nelson v. Campbell*, 541 U.S. 637, 643, 124 S. Ct. 2117, 158 L. Ed. 2d 924 (2004) ("[C]onstitutional claims that merely challenge the conditions of a prisoner's confinement, whether the inmate seeks monetary or injunctive relief, fall outside of that core and may be brought pursuant to § 1983 in the first instance.").

Here, Charest appears to challenge the conditions of his confinement rather than his conviction or sentence; thus, his claims are appropriately challenged in a section 1983 civil rights complaint, as Charest has brought in this suit.

> Indeed, but for the alleged inadequate conditions relating to COVID-19, Petitioner would not have a claim. And claims relating to conditions of confinement are more appropriately challenged in a section 1983 civil rights complaint. *See Nelson v. Campbell*, 541 U.S. 637, 643 (2004) ("[C]onstitutional claims that merely challenge the conditions of a prisoner's confinement, whether the inmate seeks monetary or injunctive relief, fall outside of th[e] core [of habeas corpus] and may be brought pursuant to § 1983 in the first instance."); *see also Keys v. Warden, FCC*

> *Coleman - Low*, No. 5:20-cv-319-Oc-02PRL, 2020 WL 3962233, at *1-2 (M.D. Fla. July 13, 2020) (dismissing without prejudice federal prisoner's § 2241 petition seeking release based on alleged conditions relating to COVID-19, because the claims "are not cognizable under § 2241" and should be brought in a civil rights complaint); *Harris v. Calif. Dep't of Corr. Chino CA*, No. EDCV20-00777-JFW(DFM), 2020 WL 3977604, at *1 (C.D. Cal. July 13, 2020) (dismissing without prejudice state prisoner's habeas petition because "the [p]etition challenge[d] the condition of [the p]etitioner's confinement [regarding the prison's response to the COVID-19 pandemic] and therefore [wa]s not cognizable on habeas review"). Moreover, while release from confinement is generally sought in habeas corpus rather than civil rights, release is not available as a remedy for unconstitutional conditions. *See Gomez v. United States*, 899 F.2d 1124, 1126 (11th Cir. 1990) ("[R]elief of an Eighth Amendment violation does not include release from confinement.").

*Hasanati v. United States*, No. 3:20-CV-942-J-32MCR, 2020 WL 6150920, at *1 (M.D. Fla. Oct. 20, 2020).

To the extent Charest challenges or seeks to challenge his immediate release or speedier release from imprisonment, his sole federal remedy is a writ of habeas corpus. *Preiser v. Rodriguez,* 411 U.S. 475, 500, 93 S. Ct. 1827, 1841, 36 L. Ed. 2d 439 (1973) (holding that "when a state prisoner is challenging the very fact or duration of his physical imprisonment and the relief he seeks is a determination that he is entitled to immediate release or speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus"). Accordingly, as a prisoner in custody pursuant to the judgment of a State court, Charest's petition is subject to the restrictions of § 2254, including the limitations of § 2244.[39]

---

[39]    The Eleventh Circuit has examined the language of § 2241 and § 2254 and determined that § 2254, which applies to persons "in custody pursuant to the judgment of a State court" is the sole avenue for a writ of habeas corpus by a convicted state prisoner. However, § 2241, which is not subject to the restrictions of § 2244, would be available to a pretrial detainee or such persons not in custody under a state court judgment. *See Thomas v. Crosby*, 371 F.3d 782, 786 (11th Cir. 2004) ("To read §§ 2241 and 2254 other than as we do would effectively render § 2254 meaningless because state prisoners could bypass

Section 2244 makes clear that a prisoner is barred from challenging the same judgment more than once, unless:

> **(A)** the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> **(B)(i)** the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> **(ii)** the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C.A. § 2244(b)(2)(A)-(B). The Supreme Court has held, "second or successive" is a term of art – it "does not simply refer to all §2254 applications filed second or successively in time." *Magwood v. Patterson*, 561 U.S. 320, 332 (2010). Rather, the term "second or successive" applies only to consecutive applications that challenge the same state court judgment as a prior application. *Id*. at 331. "[T]he judgment to which [§2244] refers is the underlying conviction and most recent sentence that authorizes the petitioner's current detention." *See Ferreira v. Sec'y, Dep't of Corr.,* 494 F.3d 1286, 1292 (11th Cir. 2007). Cutting through the rambling and conclusory allegations asserted by Charest here, it appears that Charest's challenge is not directed at a state court conviction that could have been brought in a previous petition. Thus, such claim does not necessary fall within the limitations of §2244 as alleged by Charest.

For these reasons, Charest has failed to state a claim upon which relief may be granted.

---

its requirements by proceeding under § 2241. If § 2254 were not a restriction on § 2241's authority to grant the writ of habeas corpus, and were instead a freestanding, alternative post-conviction remedy, then § 2254 would serve no function at all.").

## VI.   Conclusion.

Based on the foregoing analysis, the undersigned concludes that there are no genuine issues of material fact, and that Defendants are entitled to judgment as a matter of law on all claims and causes of action interposed by Plaintiff.  Therefore, it is recommended that Defendants' motion for summary judgment be **GRANTED** on all counts and that Plaintiff Charest's action against Defendants Kay Ivey and Mary Cooks be **DISMISSED** with prejudice.

The instructions that follow contain important information regarding objections to the report and recommendation of the Magistrate Judge.

## <u>NOTICE OF RIGHT TO FILE OBJECTIONS</u>

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); S.D. Ala. Gen.LR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th

Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this _7th__ day of __February_____ 2022.

**_/s/ Katherine P. Nelson**

_____
UNITED STATES MAGISTRATE JUDGE